IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ANGEL SALCIDO, personal representative of THE
WRONGFUL DEATH ESTATE OF CRISTAL
CERVANTES, WANDA MARTINEZ,

      Plaintiffs,

vs.                                       Civ. No. 21-01222 KG/JHR

CITY OF LAS VEGAS, LAS VEGAS POLICE
DEPARTMENT, CHIEF ADRIAN CRESPIN,
SGT. ELIAS RAEL, SAN MIGUEL COUNTY, SAN MIGUEL
COUNTY SHERIFF'S OFFICE, UNDERSHERIFF MIKE
PADILLA, DEPUTY JAYME VIGIL, NEW MEXICO
DEPARTMENT OF PUBLIC SAFETY,
NEW MEXICO STATE POLICE, JOHN DOE 1,
LT. HUGO MUNOZ, SGT. MARK LUCERO,
PATROLMAN MIGUEL SENA,

      Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER comes before this Court on a Motion for Partial Summary Judgment

(No. I): Dismissal of the State Law Negligence Claims by Defendants New Mexico Department

of Public Safety, New Mexico State Police, and New Mexico State Police Lt.enant Hugo Munoz,

Sergeant Mark Lucero, and Officer Miguel Sena (collectively "state defendants"). (Doc. 40).

The Motion is fully and timely briefed. *See* (Docs. 40, 56, 70).

In this case, we have an exceedingly unfortunate and regrettable violent murder.  The

second-guessing of the officers' actions and inactions by those who have suffered egregious loss

is understandable.  However, no reasonable jury could find state defendants liable for negligent

investigation as there is no duty to investigate crime in any particular manner or time frame and

plaintiffs do not allege state defendants ignored the crime in progress.  Furthermore, this Court

concludes that the behavior and investigation of state defendants did not cause the battery or death of Ms. Cervantes. Therefore, this Court must dismiss the state law negligence claims.

I.     Background

A. Factual Background

At the outset, this Court notes the tragic nature of the facts discussed herein, not only to those who experienced them, but also to their loved ones who may feel obligated to read these words. The facts as discussed herein are undisputed or interpreted favorably towards non-moving plaintiffs for purposes of this Motion, unless otherwise noted. (Doc. 40). Disputes regarding material facts will be discussed further as necessary in the analysis section, *see infra*.

On Sunday, November 8, 2020, sometime before 3:00 p.m., SMCSO Deputy Jayme Vigil was on random patrol, traveling on Collins Drive in Las Vegas. (Doc. 40) at 3-4 (citing I/Net Dispatcher: Event Chronology (PR 387-PR 411), p. 1, attached as Exhibit A (Doc. 40-1); SMCSO Body Cam-000000_000000_20201108144949_0013_N (PR 556), 00:00-5:31, Exhibit B). Two individuals, Guillermo (purportedly misidentified as Diamoor) Rodriguez and Patricia (purportedly misidentified as Crystal) Baca, flagged down Deputy Vigil and described a phone call Ms. Baca had received from the mother of Cristal Cervantes, Veronica Martinez ("the mother"). *Id*. at 4 (citing Exhibit B, starting at 00:01, 00:35-00:46). Ms. Baca told Deputy Vigil that the reason the mother was requesting a welfare check was because Cristal Cervantes called her mother, indicating that Alejandro Alirez, also known as "Tuffy," was at her residence on Peggy Lee Lane and was "irate." *Id*. (citing Exhibit B, 02:45-02:50; NMSP Case #20–23–1–0049–2020–23735–Supplemental No. 2 (PR 282-PR 285), p. 2, attached as Exhibit C (ECF No. 40-2)). Ms. Baca indicated to Deputy Vigil that Mr. Alirez was mentally ill and possibly psychotic. *Id*. (citing Exhibit B, 02:20-02:40). Mr. Rodriguez indicated to Deputy Vigil that Mr.

2

Alirez was armed with a handgun. *Id.* (citing Exhibit B, 01:15-02:20). Deputy Vigil relayed this information to SMCSO Deputy Devin Adkins, whose vehicle was located behind Deputy Vigil's. *Id.* at 5 (citing Exhibit B, 03:26-05:10). The deputies drove together to 409 Peggy Lee Lane to conduct a welfare check. *Id.* (citing Exhibit B, 05:25-0 5:31; Exhibit C, p. 2). The deputies parked near 411 Peggy Lee Lane. *Id.* (citing Exhibit C, p. 2; SMCSO Body Cam-000000_000000_20201108145906_0014_N (PR 557), 00:00-00:30, Exhibit D).

At approximately 14:59:06, (2:59 PM), Deputies Vigil and Adkins arrived at Ms. Cervantes' residence, and Deputy Vigil notified dispatch of their arrival using her mobile phone instead of her radio. *Id.* (citing Exhibit D, 00:01-00:30; Exhibit C, p. 2). The deputies walked up to the front door of Ms. Cervantes' residence and knocked on the security screen door. *Id.* (citing Exhibit D, 00:15-00:25). Shortly thereafter, the deputies heard a gunshot and a female screaming. *Id.* (citing Exhibit D, 00:30). This first gunshot after the deputies' arrival was fired at 14:59:37 (2:59:37 PM). *Id.* (citing Exhibit D, 00:30). Although Deputy Adkins attempted to open the security screen door, it was locked. *Id.* at 6 (citing Exhibit D, 00:34). When they heard the first shot, the deputies moved from the front to the right side of the residence. *Id.* (citing Exhibit D, 00:35-00:47). As she was making this alteration in position, Deputy Vigil called out on the radio "shots fired." *Id.* (citing Exhibit D, 00:36-00:39).

State defendants contend the deputies heard three separate gunshots fired from inside the residence after changing their position. *Id.* (citing Exhibit D, 00:30, 00:57, 01:08). Plaintiffs dispute this contention but offer no evidence to rebut the evidence cited by state defendants. *See* (Doc. 56) at 4 (UMF No. 18: disagreeing "to the extent that the deputies then heard two additional gunshots fired from inside the residence, after already hearing the first gunshot when they initially approached and knocked on the door"). When the deputies heard the purported

three additional rounds, they moved behind Deputy Vigil's vehicle, utilizing it for cover and concealment. (Doc 40) at 6 (citing Exhibit D, 01:08-01:29).

Deputy Adkins was located on the driver's side of Deputy Vigil's vehicle, armed with his Smith and Wesson M&P 9mm handgun. *Id.* (citing Exhibit C, p. 2). Plaintiffs dispute this contention regarding Deputy Adkins' position to the front or rear of the driver's side, but this is not material. *See* (Doc. 56) at 5 (UMF No. 20: disagreeing "to the extent that Exhibit C states that Deputy Adkins maintained his position near the rear driver's side wheel of Deputy Vigil's unit"). Deputy Vigil retrieved her AR 15 rifle from her trunk and utilized the trunk of her marked police vehicle as cover. (Doc. 40) at 6 (citing Exhibit C, p. 2). Again, plaintiffs disagree, although it is not entirely clear with what they disagree. *See* (Doc. 56) at 5 (UMF No. 21: Plaintiffs disagree "to the extent that Exhibit C states that Deputy Vigil 'maintained cover using the back of her marked police vehicle'"). This Court does not see a genuine dispute that is material here.

Deputy Atkins maintained his position near the rear driver's side wheel of Deputy Vigil's unit. (Doc. 40) at 6-7 (citing Exhibit C, p. 2). Next, the deputies heard rounds hitting either Deputy Vigil's or Deputy Atkins' vehicle. *Id.* at 7 (citing Exhibit C, p. 2). Deputy Vigil observed one round causing the front passenger tire to deflate, and informed radio dispatch every time a shot was fired. *Id.* (citing Exhibit C, p. 2). Neither Deputy Vigil nor Deputy Atkins shot back. *Id.* (citing Exhibit D, 00:00-01:11:10). Although plaintiffs purport to dispute state defendants' contention that the gunfire from Mr. Alirez effectively was pinning down the deputies, plaintiffs do not dispute that the deputies were taking cover and were under fire, but instead note a conversation in which Deputy Vigil's boss tells her to maintain cover and she reports this fact to Deputy Atkins. (Doc. 56) at 5 (UMF 28, citing Exhibit D, 03:15-03:48,

04:04-04:08). Again, there is no genuine dispute regarding a material fact. SMCSO Sgt. Darren

Romero arrived and assisted with the evacuation of the deputies towards a neighbor's residence,

utilizing his SMCSO police truck. (Doc. 40) at 7-8 (citing Exhibit C, p. 3).

At approximately 03:01:37 p.m., at approximately the 00:10 seconds mark, Mr. Alirez

began live streaming his actions on Facebook. *Id.* at 8 (citing NMSP Case# 20-23-1-0049-

Facebook-linked_media-videos_173163674525001 (PR 585), attached as Exhibit E). This

Facebook live stream reveals multiple facts, including the following: At approximately 3:02

p.m., the live stream begins capturing Mr. Alivez' actions. *Id.* (citing Exhibit E, 00:10-00:57).

About one second in, Mr. Alirez states: "[Ms. Cervantes] is still alive." *Id.* (citing Exhibit E,

00:11-00:12).

Approximately 5 seconds later, Mr. Alirez says the following: "Cristal. Cristal. Say

something or I am going to kill you, b****." *Id.* (citing Exhibit, 00:16-00:21). Approximately 8

seconds later, Ms. Cervantes states "I can't feel my face." *Id.* (citing Exhibit E, 00:23-00:25).

Mr. Alirez immediately demands an apology and threatens: "or I'm gonna shoot you in the face!"

*Id.* (citing Exhibit E, 00:25-00:29). However, approximately 5 seconds later, Mr. Alirez

provides an apology of sorts: "I'm sorry Cristal, but I'm killing you, fool." *Id.* at 9 (citing

Exhibit E, 00:34-00:36).

From approximately 11 seconds later, the video shows Ms. Cervantes lying on a bed in

apparent pain. *Id.* (citing Exhibit D, 00:45-00:50). Ms. Cervantes was shot in the abdomen at

some point during this encounter, as revealed in a subsequent autopsy. *Id.* (citing Office of the

Medical Inspector, Report of Findings, p. 2 (BN 69-103), attached as Exhibit G). The way she is

holding her abdomen in this video supports the conclusion that Mr. Alirez already had shot Ms.

Cervantes in the abdomen prior to the initiation of the live stream at approximately 3:01 p.m. *Id.*

(citing Exhibit E, 00:47-00:50).  Starting at approximately the 00:50 seconds mark, the video

reveals Mr. Alirez raising his handgun and pointing the muzzle of the gun in the direction of Ms.

Cervantes' head.  *Id.* (citing Exhibit E, 00:50-00:56).  Approximately six seconds later, the video

shows Mr. Alirez fire a round at Ms. Cervantes' head, shows her head move, and shows blood

splattering on the wall.  *Id.* (citing Exhibit E, 00:56).  The subsequent autopsy revealed that the

shot to the head likely produced the fatal wound.  *Id.* (citing Exhibit G, pp. 1-3 (indicating at p.

2: "the wound to the head caused the most significant damage, including skull fractures and

bleeding and injury to the brain [while] the other wounds caused minor injuries").

     Although plaintiffs indicate an intention to dispute which specific numbered shot in the

live stream corresponds to which over all shot fired, the parties do not dispute that at

approximately 03:02 p.m., at 01:08 seconds into live stream, Mr. Alirez fires another shot.  *Id.* at

10 (citing Exhibit E, 01:08); (Doc. 56) at 7, UMF 45.  Approximately fifteen seconds later, the

live stream reveals him firing another shot, still at approximately 03:02 p.m. (Doc. 40) at 10

(citing Exhibit E, 01:23); (Doc. 56) at 7, UMF 46.  The parties do not dispute that at

approximately 2:44 mark of the live stream video, Mr. Alirez fires another shot, and yet another

shot at the 2:56 mark of the live stream video. (Doc. 40) at 10 (citing Exhibit E, 02:44, 02:56);

(Doc. 56) at 7-8, UMF 48-49.

     Beginning at approximately 2:16 mark of the live stream (3:04 p.m.), the video shows the

motionless figure of Victor Cervantes, Ms. Cervantes' grandfather who lived in the residence.

(Doc. 40) at 10 (citing Exhibit E, 02:16-02:27).  At the 12:21 mark of the live stream, Mr. Alirez

states that he already has killed Victor Cervantes.  *Id.* (citing Exhibit E, 12:21-12:24).

     Beginning at approximately the 3:11 mark of the live stream video (3:04 p.m.), Mr.

Alirez states: "Oh F***, I blew her eye out dog!"  *Id.* (citing Exhibit E, 3:11-3:14).  At

approximately the 5:28 mark of the live stream video (about 3:06 p.m.), the video's soundtrack reveals Mr. Alirez firing his gun again. *Id*. at 11 (citing Exhibit E, 05:28). Beginning at approximately the 12:10 mark of the live stream video (3:09 p.m.), Mr. Alirez states that Ms. Cervantes is alive, and the video shows her breathing and making noises. *Id*. (citing Exhibit E, 12:10-12:20). At approximately the 18:35 mark of the live stream video (between about 3:19 p.m. to 3:21 p.m.), the video soundtrack reveals another firing of the gun. *Id*. (citing Exhibit E, 18:35). At approximately the 27:54 mark of the live stream video (about 3:28-3:30 p.m.), the video shows Mr. Alirez firing his gun at the police. *Id*. (citing Exhibit E, 27:54).

Beginning at approximately the 28:10 mark of the live stream video (3:29 p.m.), Mr. Alirez indicates that Ms. Cervantes still is alive, he had shot her in the stomach, and he focuses his phone on her, with the video revealing her labored breathing. *Id*. (citing Exhibit E, 28:10-28:38). Beginning at approximately the 30:48 mark of the live stream video (3:31 p.m.), Mr. Alirez states: "you can still hear her." *Id*. (citing Exhibit E, 30:48-30:52). Beginning at approximately the 38:03 mark of the live stream video (3:39 p.m.), Mr. Alirez indicates that Ms. Cervantes still is breathing. *Id*. (citing Exhibit E, 38:03-38:06). At approximately the 50:52 mark of the live stream video (3:50 p.m.), Mr. Alirez' Facebook live stream ends. *Id*. (citing Exhibit E, 50:52).

At an undetermined time after 3:08 p.m., Las Vegas Police Department ("LVPD") Sgt. Elias Rael located the Facebook live stream of Mr. Alirez. *Id*. He informed SMCSO Undersheriff Mike Padilla that Ms. Cervantes still was alive and he left his body camera there to record the live stream, and left his unit with his assault rifle. *Id*. at 11-12 (citing NMSP Case# 20-23-1-0049 LVPD AXON Body Video 2020-11-08(1)(PR 542), 00:49-04:20, 04:21-42:32

(where live stream stops), Exhibit H; NMSP Case# 20-23-1-0049 LVPD AXON Body Video

2020-11-08(2)(PR 543), 00:05-12:19, Exhibit I).

At approximately 4:06 p.m., Sgt. Mark Lucero arrived at 409 Peggy Lee Lane.   *Id.* at 12

(citing Second Amended Complaint, ¶ 58 (Doc. 19)).  There is no evidence showing Sgt. Lucero

arriving on the scene before Ms. Cervantes was shot fatally.  *Id.*

At approximately 15:38 hrs. (3:38 p.m.), NMSP Northern Dispatch Center dispatched

Officer Miguel Sena to respond to 904 Peggy Lee Lane.  *Id.* (citing Second Amended Complaint,

(Doc. 19) at ¶ 95).  There is no evidence showing Officer Sena arrived on the scene before Ms.

Cervantes was shot fatally.  *Id.*

At approximately 3:03 p.m., Officer Pretlow was on duty in San Miguel County.  *Id.*

Upon hearing a report that the SMCSO called "shots fired," Officer Pretlow assigned himself to

assist with this incident and arrived at approximately 3:14 p.m.  *Id.*  (citing Second Amended

Complaint, (Doc. 19) at ¶ 33).  There is no evidence showing Officer Pretlow arriving on the

scene before Mr. Cervantes was shot fatally.  *Id.* at 13.

At approximately 4:03 p.m., NMSP North Communications dispatched Officer Adam

Vigil to proceed to 409 Peggy Lee Lane in reference to a shooting.  *Id.*  He arrived on the scene

at approximately 4:04 p.m.  *Id.*  There is no evidence showing Officer Vigil arriving on the scene

prior to Ms. Cervantes being shot fatally.  *Id.*

At approximately 2:58 p.m., Officer Ronald Duran responded to a shots fired call at 409

Peggy Lee Lane. *Id.* (citing Second Amended Complaint, (Doc. 19) at ¶ 41).  Officer Duran

arrived on the scene at approximately 3:20 p.m.  *Id.* (citing Second Amended Complaint, (Doc.

19) at ¶ 41).  There is no evidence showing Officer Duran arriving on the scene prior to Ms.

Cervantes being shot fatally.  *Id.*

Based on the request made by NMSP Sergeant Mark Lucero, the NMSP Tactical Team was activated at 15:26:36 (3:26 p.m.). *Id.* (citing Exhibit A, p. 1). There is no evidence demonstrating that the NMSP Tactical Team was activated before Ms. Cervantes was shot fatally. *Id.* at 14.

The first NMSP Tactical Team officer arrived at Peggy Lee Lane at 15:39:00 (3:39 p.m.). *Id.* (citing Exhibit A, p. 2). Although Plaintiffs dispute this fact, as noted by state defendants, their "response to DMF No. 77 is nothing more than counsel's unsupported interpretation of the abbreviation 'DP' used in the I/Net Dispatcher: The Event Chronology [without offering] evidence supporting their interpretation." (Doc. 70) at 8, UMF 77 (citations omitted); (Doc. 56) at 10. This Court concludes that for purposes of this Motion, this fact is undisputed as a matter of law. *See GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200–01 (10th Cir. 2022) (citations omitted) (nonmoving party cannot rely upon conclusory allegations, contentions of counsel, speculation, suspicion, or conjecture to defeat summary judgment). Plaintiffs' counsel's speculation is insufficient to create a genuine dispute.

Defendant, NMSP Tactical Team Lieutenant Hugo Munoz, arrived at the scene at 17:36:53 (5:36 p.m.). (Doc. 40) at 14 (citing Exhibit A, p. 10). Although plaintiffs attempt to dispute this fact based on the same unsupported speculation of counsel, again, such speculation is insufficient to create a genuine dispute. (Doc. 56) at 10. The parties agree that there is no evidence showing that Lt. Munoz arrived on the scene before Ms. Cervantes died. (Doc. 40) at 14.

At approximately 3:25 p.m., Tactical Team Lt. Munoz directed the NMSP Tactical Team to respond to "an armed barricaded subject currently firing rounds at officers" in Las Vegas. *Id.* at 14-15 (citing NMSP Case #20-23-1-0049-2020-23735 – Supplemental No. 14 – Attachment-

S1-TM-20-111 Supplemental No. 1 (PR 432-PR 435), p. 2, attached as Exhibit J, (Doc. 40-5)).

After activating the NMSP Tactical Team, Crisis Negotiation Team ("CNT"), and Explosive

Ordinance Disposal ("EOD") Units, Lt. Munoz requested assistance from the Albuquerque

Police Department SWAT team because a majority of the NMSP Tactical Team was in

Farmington prepping for a warrant service.  *Id.* at 15 (citing Exhibit J, p. 2).

While on route to the scene, the Tactical Team officers learned that Mr. Alirez was live

streaming himself on Facebook Live.  *Id.* (citing Exhibit J, p. 2).  Although plaintiffs purportedly

dispute that the entire team learned of this, plaintiffs offer no evidence to support any other

interpretation.  (Doc. 56) at 10, UMF 82-84.  Furthermore, they do not dispute that Mr. Alirez

was claiming that he had shot a female (Ms. Cervantes) in the stomach, nor do they dispute that

NMSP Lt.. Bobnock located the live stream and provided "the team" with an update that Mr.

Alirez shot the female in the head.  *Id.*; (Doc. 40) at 15 (citing Exhibit J, p. 2).  There is no

genuine dispute regarding a material fact here.

NMSP Crisis Negotiators were able to contact Mr. Alirez on the phone.  (Doc. 40) at 15

(citing Exhibit J, p. 2).  Mr. Alirez stated that all the people inside were dead.  *Id.*  (citing Exhibit

J, p. 2).  However, the team members were unable to confirm that all persons inside were dead as

Mr. Alirez had claimed.  *Id.*  (citing Exhibit J, p. 2).  The video only showed Mr. Alirez shooting

Ms. Cervantes.  *Id.*  (citing Exhibit J, p. 2).

While the Tactical Team was setting up, CNT informed the Tactical Team that Mr. Alirez

fired another round out of the house and made statements that he was going to come out shooting

because he only had a few rounds left for cops.  *Id.*  (citing Exhibit J, p. 2).  Again, although

plaintiffs purport to dispute whether CNT informed the entire team or simply the sergeant who

authored the report documenting the incident, plaintiffs offer no evidence in rebuttal.  There is no genuine dispute about a material fact.

The parties do not dispute that Mr. Alirez also informed CNT that he had artillery shells. *Id.* at 16 (citing Exhibit J, p. 2).  Tactical Team Sgt. Jonathan Tenorio directed the Tactical Team to develop a chemical munitions plan.  *Id.* (citing Exhibit J, p. 2).  Although plaintiffs purport to create a dispute regarding the identity of the individual who directed the Tactical Team to develop a chemical munitions plan, they do not offer any counter evidence or counter interpretation.  (Doc. 56) at 11, UMF 91.  They also do not indicate the relevance, that is, how the fact is material.  Again, this Court concludes there is no genuine dispute regarding any material fact.

Chemical munitions were deployed to disorient Mr. Alirez and potentially force him to exit the residence.  (Doc. 40) at 16 (citing Exhibit J, p. 2).  After chemical munitions were deployed, CNT advised that Mr. Alirez was still on the phone and sounded like he was wearing a gas mask.  *Id.* (citing Exhibit J, p. 2).  Mr. Alirez told CNT that he would be exiting out the back door.  *Id.* (citing Exhibit J, p. 2).  At approximately 5:26 p.m., uniform officers apprehended Mr. Alirez when he exited the back door.  *Id.* (citing Exhibit J, p. 2; Exhibit A, p. 10).

Tactical Team members subsequently made entry through the back door Mr. Alirez utilized to exit.  *Id.* (citing Exhibit J, p. 2).  Entry officers found an unresponsive male and female inside the residence, both with apparent gunshot wounds.  *Id.* (citing Exhibit J, p. 2).

On November 8, 2020, at 10:00 p.m., NMSP Agent Kevin Keiner completed an Affidavit for Arrest Warrant for Mr. Alirez, setting forth the factual basis justifying his arrest for the murder of Ms. Cervantes, among other charges.  *Id.* (citing Affidavit for Arrest Warrant, attached as Exhibit K (Doc. 40-6)).  On November 8, 2020, New Mexico Magistrate Judge

Christian E. Montaño issued an Arrest Warrant for Mr. Alirez with a "no bond hold." *Id.* at 17

(citing Arrest Warrant, attached as Exhibit L (Doc. 40-7)). On November 9, 2020, NMSP Agent

Kevin Keiner filed a Criminal Complaint, charging Mr. Alirez with the murder of Ms. Cervantes,

among other charges. *Id.* (citing Docket for State of New Mexico v. Alejandro Alirez, M-48-FR-

2020-00359, attached as Exhibit M (Doc. 40-8)).

B. *Procedural History*

Angel Salcido, personal representative of the wrongful death estate of Cristal Cervantes,

and Wanda Martinez, ("plaintiffs"), filed a complaint against state defendants that was removed

to this Court on December 29, 2021. (Doc. 1). As relevant for this Motion, plaintiffs allege

state law claims for negligent investigation resulting in battery and wrongful death under the Tort

Claims Act, as well as negligent training, supervision and retention; and loss of consortium.

(Doc. 19 (amended complaint, Counts II-IV)) at ¶¶ 139-55, 156-61, 162-167. On May 2, 2022,

state defendants filed the Motion for Summary Judgment of the state law negligence claims,

which, is fully briefed. (Docs. 40, 56, 70).

II. *Standards of Law*

A. *Summary Judgment*

Summary judgment should be granted if the movant establishes that there is no genuine

dispute of material fact "and that the movant is entitled to judgment as a matter of law." *Sawyers

v. Norton*, 962 F.3d 1270, 1282 (10th Cir. 2020) (quoting Fed. R. Civ. P. 56(a)). A fact is

considered material if it "might affect the outcome of the suit under the governing law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" if the evidence

is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Id.*

The parties must support factual allegations with evidence and the Court is free to consider materials such as depositions, documents, and affidavits. Fed. R. Civ. P. 56(c)(1)(A). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the nonmovant is required to put in the record facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 248.

In applying this standard, the Court resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant. *See Hunt v. Cromartie*, 526 U.S. 541, 551–52 (1999) (quoting *Anderson*, 477 U.S. at 255). However, the nonmoving party cannot rely upon conclusory allegations, contentions of counsel, speculation, suspicion, or conjecture to defeat summary judgment. *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988) (citations omitted); *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200–01 (10th Cir. 2022) (citations omitted). A "plaintiff's version of the facts must find support in the record." *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011) (citation omitted). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *GeoMetWatch Corp.*, 38 F.4th at 1200 (quoting *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098 (10th Cir. 2019)).

### B. *State Law Negligence under the Tort Claims Act*

The New Mexico Tort Claims Act ("NMTCA") waives immunity for battery and wrongful death "caused by law enforcement officers while acting within the scope of their duties." NMSA 1978 § 41-4-12 (Cum. Supp. 2020). Furthermore, Section 29-1-1 imposes an

affirmative duty to investigate; and officers can be held liable if their "conduct was negligence that proximately caused" injury. *Schear v. Board of County Commissioners*, 101 N.M. 671, 677 (1984) (citing NMSA 1978 § 29-1-1 (Repl. Pamp. 1994) (declaring it to be the duty of every peace officer "to investigate all violations of the criminal laws of the state which are called to the attention of any such officer or of which he is aware")).  The New Mexico Supreme Court noted concerns about strict liability and concluded it does not apply: "Liability will not attach until all of the elements of negligence have been proved, including duty, breach of duty, and proximate cause." *Id*. at 676.

In *Schear*, the New Mexico Supreme Court held that "a governmental entity and its law enforcement officers may be held liable, after receiving notice, for negligently failing to take adequate action to protect a citizen from imminent danger and injuries." 101 N.M. at 672 (interpreting NMSA 1978 Section 29-1-1 (replacement pamphlet 1979), NMSA 1978 § 41-4-12). The court noted that although the determination of whether negligence occurred generally is a question for the jury, whether any duty exists as an initial determination "is a question of law for the courts to decide." *Id*. (citations omitted).  The court further interpreted the clause "when caused by law enforcement officers," noting that it does not require commission of the tort by the officer, "but instead has the usual meaning of 'proximate cause' as a requirement for liability in an ordinary negligence case."  *Id*. at 673 (citing *Methola v. County of Eddy*, 95 N.M. 329, 332 (1981)).

III.    *Negligent Investigation*

State defendants contend plaintiffs seek to expand state officers' statutory duty to investigate beyond the bounds established by New Mexico precedent because plaintiffs "would have this Court hold that law enforcement is required to enter a house in a particular manner or at

14

a particular time, even when officer safety is at risk." (Doc. 70) at 10. According to state

defendants, "New Mexico case law has held that the duty to investigate is far narrower and

'generally directs officers to take steps necessary to prosecute suspected criminals, such as filing

complaints against the suspect, bringing them before the courts, and assisting the prosecution.'"

*Id.* at 10-11 (quoting *Weinstein v. City of Santa Fe*, 1996-NMSC-021, ¶ 34, 121 N.M. 646, 655).

State defendants argue they met this standard by arresting and charging Mr. Alirez. (Doc. 40) at

20. State defendants also contend that "Section 29-1-1 does not impose a duty on law

enforcement personnel to risk their own lives while investigating a criminal violation and

plaintiffs site no authority to the contrary." (Doc. 70) at 11. Plaintiffs respond by restating their

allegations and arguing that there are genuine issues of material fact for the jury regarding

whether state defendants met their statutory duty imposed by NMSA 1978 Section 29-1-1. (Doc.

56) at 12-14.

    *A. Negligent Investigation Allegations*

       Plaintiffs allege that under NMSA 1978 § 29-1-1, NMSP had a statutory and common

law duty "to investigate all violations of the criminal laws of the state which are called to the

attention of any such officer or of which he is aware," specifically regarding Ms. Cervantes'

safety. (Doc. 19) at ¶ 140. Plaintiffs allege that the NMSP personnel "failed to engage in their

statutory-allowed and mandated duties to take any action toward saving the life of Crystal

Cervantes," alleging also common-law duties on police officers. *Id.* at ¶ 140 (citing *Torres v.*

*State*, 195-NMSC-025, ¶ 20, 119 N.M. 609 (common law purportedly imposes liability on police

officers for "harm caused by the negligent performance of their statutory duty to investigate

crime")). Plaintiffs allege that all defendants failed to develop a reasonable plan and failed

overall to respond and communicate appropriately to the "dynamic" situation that was not only

life threatening to the victims in the residence but also to other residents in the area as well as the

officers on scene. *Id.* at ¶¶ 144-47. Plaintiffs complain specifically about these issues with

regards to the availability of the Facebook live stream video information. *See id.* at ¶¶ 147-48.

They allege state defendants' failures to respond better resulted in the death of Ms. Cervantes.

*Id.* at ¶ 149.

### B. *Negligent Investigation Analysis*

Although plaintiffs cite *Schear*, state defendants correctly note "that case involved the

sheriff's department complete failure to respond to a call reporting a crime in progress and

requesting assistance and there was no indication that the suspect posed a continuing deadly

threat to the deputies." (Doc. 70) at 11 (citing *Schear*, 1984-NMSC-079, ¶¶ 1-3, 101 N.M. at

672 n.1). This Court concludes this matter is distinguishable from *Schear* as in *Schear*, "the

Chief of Police [] chose to continue a conversation with a visitor rather than to respond" to

witnesses' report of a 12-year-old boy being dragged into a vacant house by an adult male who

sexually assaulted the boy. *See id.* There are no allegations that state defendants completely

ignored at any point in time the events regarding Mr. Alirez shooting Ms. Cervantes.

State defendants note that it is undisputed that Mr. Alirez consistently was firing shots at

state officers over an extended period; it is undisputed that Mr. Alirez informed the CNT that "he

was going to come out shooting because he only had a few rounds left for cops;" and it is

undisputed that Mr. Alirez told CMT that he had artillery shells. (Doc. 70) at 11 (quoting

Exhibit J, p. 2); *see also* (Docs. 40, 56) at UMF 18-19, 24-25, 55-56, 89, 90. Based on these

undisputed facts, and on the immediate deadly threat Mr. Alirez continuously posed to law

officers, state defendants contend that they "did not have a legal duty to investigate by entering

the house and risking their own lives, even if there was a possibility that Ms. Cervantes would

have survived had they entered sooner." *Id.* For the reasons discussed further below, this Court concludes state defendants' arguments are persuasive.

State defendants cite *Ruff v. Bd of Regents of the Univ. of N.M.*, in support of their argument that they cannot be held liable for failing to investigate the incident in a particular manner as a matter of law.   (Doc. 70) at 11 (citing 2018 WL 565705, No. 16-CV-1140 MCA/LF (D.N.M. January 24, 2018) (unpublished opinion) (other citations omitted).  In *Ruff*, falsely accused and arrested individuals sued officers who allegedly failed to investigate to find the actual perpetrator even though evidence demonstrated the officers knew they were pursuing and prosecuting individuals innocent of the crime.  *Id.* at *3.  Presuming their allegations were true, even after the innocent individuals' attorney provided exculpatory evidence, the defendant officers spoke to the purported victim, "suggesting to her that she was mistaken about details in the video, thus attempting to influence her to 'alter her previous testimony.'"  *Id.*  The investigation ultimately led to the finding that there was "no credible or actionable evidence" against the purported falsely accused and arrested individuals, but only after two of them were indefinitely suspended from playing college football and the third was indefinitely banned from campus.  *Id.*  Nevertheless, the district court granted the motion to dismiss, holding that the plaintiffs had failed to state a claim under Section 29-1-1.  *Id.* at *21.  The court noted that law enforcement officers generally have a duty to exercise ordinary care but suggested this duty is "to members of the public who are at risk of injury by a criminal offender when the officers are performing or attempting to perform their duties."  *Id.* at *20 (quoting *Cross v. City of Clovis*, 1988-NMSC-045, ¶ 6, 107 N.M. 251).  The court concluded that the plaintiffs had failed "to cite to any case holding that Section 29-1-1 creates a duty to investigate in a particular manner, and

[did] not find support for such a reading in either the language of Section 29-1-1 or the case authorities construing the statute." *Id.*

This is similar to the issue presented to this Court here in that plaintiffs complain about the way state defendants investigated the case. Like the plaintiffs in *Ruff*, plaintiffs before this Court have failed to cite any case holding that Section 29-1-1 creates any duty to anyone to investigate crimes in any particular manner. *See id.* This Court finds the reasoning and holding of *Ruff* persuasive, although it is neither binding nor published authority.

State defendants correctly note that plaintiffs "failed to distinguish or otherwise refute the authorities cited by state defendants holding that law enforcement officers cannot be held liable for failing to investigate an incident in a particular manner." (Doc. 70) at 11 (citations omitted). In their response, plaintiffs argue that it is for a jury to determine if the way the NMSP's tactical teams and other officers investigated Mr. Alirez' actions satisfied state defendants' "statutory duty imposed under Section 29-1-1." (Doc. 56) and 14. However, as noted by defendants, plaintiffs fail to respond to defendants' argument that as a matter of law there is no possible liability as there is no duty to investigate crime in any particular manner or time frame. *See generally* (Doc. 56).

In the context of the facts presented here that are undisputed or interpreted in plaintiffs' favor, this Court concludes as a matter of law that no reasonable jury could find state defendants liable for negligent investigation as there is no duty to investigate crime in any particular manner or time frame. *See Ruff*, 2018 WL 565705 at *20 (plaintiffs failed "to cite to any case holding that Section 29-1-1 creates a duty to investigate in a particular manner, and the court does not find support for such a reading in either the language of Section 29-1-1 or the case authorities construing the statute"). State defendants did investigate the crimes in that they arrested Mr.

Alirez and criminally charged him: plaintiffs have not demonstrated state defendants had a

statutory duty beyond that. *See id.* Although plaintiffs contend it is for the jury to determine if a

breach of duty occurred, as they acknowledge, this Court first must determine the presence of a

relevant duty. *See Schear*, 101 N.M. at 676 ("Liability will not attach until all of the elements of

negligence have been proved, including duty, breach of duty, and proximate cause"); (Doc. 56)

at 13 ("Whether a duty exists is a question of law for the courts to decide") (citation omitted).

For the reasons stated, this Court concludes that the negligent investigation/failure to

investigate claim against state defendants shall be dismissed.

IV.     *Negligence resulting in battery and wrongful death*

Plaintiffs argue that the jury must decide whether the conduct of state defendants "was

the proximate cause of the plaintiffs' injuries." (Doc. 56) at 15.  Plaintiffs' overall argument is

that "it is possible that if [state defendants] had acted faster… they could have saved [Ms.

Cervantes'] life." (Doc. 56) at 15.  Plaintiffs contend that it "does not matter that she received a

gunshot wound to her head before the defendants were dispatched." *Id.*

State defendants reply that even "if there was a chance that Ms. Cervantes could have

survived had state defendants apprehended Mr. Alirez sooner, their investigation still did not

cause Mr. Alirez to commit the enumerated tort of battery as this tort had already occurred

before the first state defendant was notified of the shooting." (Doc. 70) at 13.

The NMTCA only waives immunity for battery and wrongful death when it is "caused by

law enforcement officers while acting within the scope of their duties."  NMSA 1978 § 41-4-12

(Cum. Supp. 2020).  Regarding causation, under New Mexico law, for behavior to be a "cause"

of an injury, it must be the case that the "injury would not have occurred" without it.  UJI 13-305

(2023) NMRA Causation (proximate cause).  Furthermore, it "need not be the only explanation

for the injury, nor the reason that is nearest in time or place." *Id.* "It is sufficient if it occurs in combination with some other cause to produce the result." *Id.*

Furthermore, Section 41-4-12 does not create liability for a claim of general negligence. *See Dickson v. City of Clovis*, 2010-NMCA-058, ¶ 19, 148 N.M. 831 ("no case has held that simple negligence in the performance of a law enforcement officer's duty amounts to commission of one of the torts listed in Section 41-4-12") (citing *Lessen v. City of Albuquerque*, 2008 NMCA 85, ¶ 38, 144 N.M. 314); *see also Bober v N.M. State Fair*, 1991-NMSC-031, ¶ 32, 111 N. M. 644, 653-54 (same). Instead, "allegations of negligence based on one of the torts specified in Section 41-4-12 are appropriate only when a law enforcement officer's negligence allegedly caused a third party to commit one of the enumerated intentional acts." *Id.* at ¶ 20 (citing *Lessen*, 2008 NMCA 85, ¶ 39).

### A. Negligence Allegations

Plaintiffs argue their allegations in the complaint support their argument "that the actions and inactions of state defendants, upon arrival at and engagement with the active shooter/hostage scene at Peggy Lane, virtually guaranteed the death of Crystal Cervantes." (Doc. 56) at 3; (Doc. 19) at ¶¶ 144-49. In their complaint, plaintiffs allege:

> 148. All Defendants breached their duty to evaluate and process properly the tactical insight to be gained by virtue of a continuing real-time livestream of the active shooters' activities, whereabouts, intentions, and respective conditions of live captives inside 409 Peggy Lane. This duty included adapting any command structure/tactical plan for police intervention to the data that should have been processed in real-time for the active shooter himself. This breach included a complete break-down and essential absence in inter and intra-agency communication and communication between supervisory personnel and subordinate personnel, and other reasonable and necessary actions designed to save the lives of the known live captives at Peggy Lane.
>
> 149. The breach of these duties by all Defendants, supervisory and subordinate personnel from each police agency *resulted in the battery* and

20

> wrongful death of Crystal Cervantes for which immunity has been waived
> under the New Mexico Tort Claims Act.

(Doc. 19) at ¶¶ 148-49 (emphasis added).

B. *Negligence Analysis*

State defendants contend their actions and inactions "did not cause Mr. Alirez to commit the enumerated tort of battery as this tort had already occurred before the first state defendant was notified of the shooting." (Doc. 70) at 13. State defendants acknowledge "the death of Ms. Cervantes was certainly a tragedy, [but contend that] nothing state defendants did or did not do caused Mr. Alirez to batter her." *Id*. State defendants contend that it is "telling that plaintiffs cite no authority recognizing a claim under Section 41-4-12 when an officer's alleged negligence solely exacerbates the injury caused by a third party's prior commission of an enumerated tort." *Id*.

Plaintiffs contend that it "does not matter that she received a gunshot wound to her head before the defendants were dispatched [and] also does not matter that none of the state defendants arrived on the scene before Cristal was fatally shot." (Doc. 56) at 15. They contend that a jury must decide "issues of fact regarding whether state defendants' negligent investigation was the proximate cause of plaintiff's' injuries." *Id*. at 14.

However, this Court concludes that as a matter of law, no reasonable jury could find that the behavior of state defendants caused the battery to Ms. Cervantes resulting in her death because the battery occurred before they arrived. *See* (Docs. 40, 56, UMF 62-79); *Dickson*, 2010-NMCA-058, ¶ 20, 148 N.M. 831 ("allegations of negligence based on one of the torts specified in Section 41-4-12 are appropriate only when a law enforcement officer's negligence allegedly caused a third party to commit one of the enumerated intentional acts") (citing *Lessen*, 2008 NMCA 85, ¶ 39).

For the reasons stated, this Court concludes that the negligence resulting in battery and wrongful death claim against state defendants shall be dismissed.

V.   *Negligent Training*

State defendants acknowledge that the NMTCA "waives immunity for negligent training and supervision by a law enforcement officer that causes the commission by a subordinate law enforcement officer of a tort listed in Section 41-4-12." (Doc. 40) at 22 n.11 (citing *McDermitt v. Corr. Corp. of Am.*, 1991-NMCA-034, ¶ 7, 112 N. M. 247, 249).  However, state defendants correctly contend that because plaintiffs do not have a viable battery or negligence claim against state defendants, "the claim for negligent hiring, training, and supervision is also not viable." *Id.* at 22-23 n. 11.

For the reasons stated, this Court concludes that the claim for negligent hiring, training, and supervision against state defendants must be dismissed (Count III).  The claim for Loss of Consortium (Count IV) also is a claim depending on the existence of another tort, and so too, must be dismissed. *See* (Doc. 19) at ¶ 163 ("all defendants … caused the Battery and Wrongful death of Cristal Cervantes"), ¶ 167 ("As a direct and proximate cause of the negligence of all defendants, Plaintiff Wanda Martinez suffered damages to include emotional pain and suffering and loss of consortium").

VI.   *Conclusion*

For the reasons discussed, this Court concludes that no reasonable jury could find state defendants liable for negligent investigation as there is no duty to investigate crime in any particular manner or time frame.  Furthermore, this Court concludes that the behavior and investigation of state defendants did not cause the battery or death of Ms. Cervantes.  Therefore,

22

this Court grants in part state defendants' Motion for Partial Summary Judgment (No. II) on the

state law negligence claims:

1) State defendants' Motion for Partial Summary Judgment (No. I) on the

negligent investigation claim; negligence resulting in battery and wrongful death

claim; negligent hiring, training, and supervision; and consortium claim is granted

in part.

2) The negligent investigation claim (Count II); negligence resulting in battery

and wrongful death claim (Count II); negligent hiring, training, and supervision

claim (Count III); and consortium claim (Count IV) against state defendants are

dismissed with prejudice; and,

3) as state defendants' do not support their request for attorney's fees (or costs)

with any citation or statutory authority, this portion of their Motion is denied.

IT IS SO ORDERED.

_____
UNITED STATES DISTRICT JUDGE