IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ANGEL SALCIDO, personal representative of THE
WRONGFUL DEATH ESTATE OF CRISTAL
CERVANTES, WANDA MARTINEZ,

      Plaintiffs,

vs.                                        Civ. No. 21-01222 KG/JHR

CITY OF LAS VEGAS, LAS VEGAS POLICE
DEPARTMENT, CHIEF ADRIAN CRESPIN,
SGT. ELIAS RAEL, SAN MIGUEL COUNTY, SAN MIGUEL
COUNTY SHERIFF'S OFFICE, UNDERSHERIFF MIKE
PADILLA, DEPUTY JAYME VIGIL, NEW MEXICO
DEPARTMENT OF PUBLIC SAFETY,
NEW MEXICO STATE POLICE, JOHN DOE 1,
LT. HUGO MUNOZ, SGT. MARK LUCERO,
PATROLMAN MIGUEL SENA,

      Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before this Court on a Motion for Partial Summary Judgment

(No. II) by Defendants New Mexico Department of Public Safety, New Mexico State Police, and

New Mexico State Police Lieutenant Hugo Munoz, Sergeant Mark Lucero, and Officer Miguel

Sena (collectively "state defendants"). (Doc. 41). The Motion is fully and timely briefed. *See*

(Docs. 41, 57, 71).

In this case, we have an exceedingly unfortunate and regrettable violent murder. The

second-guessing of the officers' actions and inactions by those who have suffered egregious loss

is understandable. However, this Court must apply the general rule that a state is not liable for

the violent actions of private individuals because neither the state nor its officers created the

danger suffered or increased the vulnerability of the victim to the danger. In addition, although

everyone wishes earlier efficacious action could have prevented the violence, the fact remains that none of the actions or inactions by the State or its officers shocks the conscience. As a result, plaintiffs' Due Process claims against state defendants must be dismissed.

I.     Background

A.  Factual Background

At the outset, this Court notes the tragic nature of the facts discussed herein, not only to those who experienced them, but also to their loved ones who may feel obligated to read these words. For state defendants' Motion for Partial Summary Judgment (No. II), addressed herein (Doc. 41), they incorporate "the Undisputed Material Facts ('UMF') set forth in their Motion for Partial Summary Judgment No. 1: Dismissal of the Estate's State Law Negligence Claims." (Doc. 41) at 6 (citing (Doc. 40)); (for plaintiffs' individual responses to state defendants' UMF, *see* (Doc. 56)). The facts as discussed herein are undisputed or interpreted favorably towards non-moving plaintiffs for purposes of this Motion, unless otherwise noted. (Doc. 41). Disputes regarding material facts will be discussed further as necessary in the analysis section, *see infra.*

On Sunday, November 8, 2020, sometime before 3:00 p.m., SMCSO Deputy Jayme Vigil was on random patrol, traveling on Collins Drive in Las Vegas. (Doc. 40) at 3-4 (citing I/Net Dispatcher: Event Chronology (PR 387-PR 411), p. 1, attached as Exhibit A (Doc. 40-1); SMCSO Body Cam-000000_000000_20201108144949_0013_N (PR 556), 00:00-5:31, Exhibit B). Two individuals, Guillermo (purportedly misidentified as Diamoor) Rodriguez and Patricia (purportedly misidentified as Crystal) Baca, flagged down Deputy Vigil and described a phone call Ms. Baca had received from the mother of Cristal Cervantes, Veronica Martinez ("the mother"). *Id.* at 4 (citing Exhibit B, starting at 00:01, 00:35-00:46). Ms. Baca told Deputy Vigil that the reason the mother was requesting a welfare check was because Cristal Cervantes called

her mother, indicating that Alejandro Alirez, also known as "Tuffy," was at her residence on Peggy Lee Lane and was "irate." *Id.* (citing Exhibit B, 02:45-02:50; NMSP Case #20–23–1–0049–2020–23735–Supplemental No. 2 (PR 282-PR 285), p. 2, attached as Exhibit C (ECF No. 40-2)).  Ms. Baca indicated to Deputy Vigil that Mr. Alirez was mentally ill and possibly psychotic. *Id.* (citing Exhibit B, 02:20-02:40).  Mr. Rodriguez indicated to Deputy Vigil that Mr. Alirez was armed with a handgun. *Id.* (citing Exhibit B, 01:15-02:20).  Deputy Vigil relayed this information to SMCSO Deputy Devin Adkins, whose vehicle was located behind Deputy Vigil's. *Id.* at 5 (citing Exhibit B, 03:26-05:10).  The deputies drove together to 409 Peggy Lee Lane to conduct a welfare check. *Id.* (citing Exhibit B, 05:25-0 5:31; Exhibit C, p. 2).  The deputies parked near 411 Peggy Lee Lane. *Id.* (citing Exhibit C, p. 2; SMCSO Body Cam-000000_000000_20201108145906_0014_N (PR 557), 00:00-00:30, Exhibit D).

At approximately 14:59:06, (2:59 PM), Deputies Vigil and Adkins arrived at Ms. Cervantes' residence, and Deputy Vigil notified dispatch of their arrival using her mobile phone instead of her radio. *Id.* (citing Exhibit D, 00:01-00:30; Exhibit C, p. 2).  The deputies walked up to the front door of Ms. Cervantes' residence and knocked on the security screen door. *Id.* (citing Exhibit D, 00:15-00:25).  Shortly thereafter, the deputies heard a gunshot and a female screaming. *Id.* (citing Exhibit D, 00:30).  This first gunshot after the deputies' arrival was fired at 14:59:37 (2:59:37 PM). *Id.* (citing Exhibit D, 00:30).  Although Deputy Adkins attempted to open the security screen door, it was locked. *Id.* at 6 (citing Exhibit D, 00:34).  When they heard the first shot, the deputies moved from the front to the right side of the residence. *Id.* (citing Exhibit D, 00:35-00:47).  As she was making this alteration in position, Deputy Vigil called out on the radio "shots fired." *Id.* (citing Exhibit D, 00:36-00:39).

State defendants contend the deputies heard three separate gunshots fired from inside the residence after changing their position. *Id.* (citing Exhibit D, 00:30, 00:57, 01:08). Plaintiffs dispute this contention but offer no evidence to rebut the evidence cited by state defendants. *See* (Doc. 56) at 4 (UMF No. 18: disagreeing "to the extent that the deputies then heard two additional gunshots fired from inside the residence, after already hearing the first gunshot when they initially approached and knocked on the door"). When the deputies heard the purported three additional rounds, they moved behind Deputy Vigil's vehicle, utilizing it for cover and concealment. (Doc 40) at 6 (citing Exhibit D, 01:08-01:29).

Deputy Adkins was located on the driver's side of Deputy Vigil's vehicle, armed with his Smith and Wesson M&P 9mm handgun. *Id.* (citing Exhibit C, p. 2). Plaintiffs dispute this contention regarding Deputy Adkins' position to the front or rear of the driver's side, but this is not material. *See* (Doc. 56) at 5 (UMF No. 20: disagreeing "to the extent that Exhibit C states that Deputy Adkins maintained his position near the rear driver's side wheel of Deputy Vigil's unit"). Deputy Vigil retrieved her AR 15 rifle from her trunk and utilized the trunk of her marked police vehicle as cover. (Doc. 40) at 6 (citing Exhibit C, p. 2). Again, plaintiffs disagree, although it is not entirely clear with what they disagree. *See* (Doc. 56) at 5 (UMF No. 21: Plaintiffs disagree "to the extent that Exhibit C states that Deputy Vigil 'maintained cover using the back of her marked police vehicle'"). This Court does not see a genuine dispute that is material here.

Deputy Atkins maintained his position near the rear driver's side wheel of Deputy Vigil's unit. (Doc. 40) at 6-7 (citing Exhibit C, p. 2). Next, the deputies heard rounds hitting either Deputy Vigil's or Deputy Atkins' vehicle. *Id.* at 7 (citing Exhibit C, p. 2). Deputy Vigil observed one round causing the front passenger tire to deflate, and informed radio dispatch every

time a shot was fired. *Id.* (citing Exhibit C, p. 2).  Neither Deputy Vigil nor Deputy Atkins shot back. *Id.* (citing Exhibit D, 00:00-01:11:10).  Although plaintiffs purport to dispute state defendants' contention that the gunfire from Mr. Alirez effectively was pinning down the deputies, plaintiffs do not dispute that the deputies were taking cover and were under fire, but instead note a conversation in which Deputy Vigil's boss tells her to maintain cover and she reports this fact to Deputy Atkins.  (Doc. 56) at 5 (UMF 28, citing Exhibit D, 03:15-03:48, 04:04-04:08).  Again, there is no genuine dispute regarding a material fact.  At 03:08:12 p.m., Undersheriff Mike Padilla again ordered over the radio that all units remain covered.  (Doc. 57) at p. 6, ¶ 16; (Doc. 71) at 4 (UMF 16).  SMCSO Sgt. Darren Romero arrived and assisted with the evacuation of the deputies towards a neighbor's residence, utilizing his SMCSO police truck. (Doc. 40) at 7-8 (citing Exhibit C, p. 3).

At approximately 03:01:37 p.m., at approximately the 00:10 seconds mark, Mr. Alirez began live-streaming his actions on Facebook.  *Id.* at 8 (citing NMSP Case# 20-23-1-0049-Facebook-linked_media-videos_173163674525001 (PR 585), attached as Exhibit E).  This Facebook live stream reveals multiple facts, including the following:  At approximately 3:02 p.m., the live stream begins capturing Mr. Alivez' actions.  *Id.*  (citing Exhibit E, 00:10-00:57). About one second in, Mr. Alirez states: "[Ms. Cervantes] is still alive." *Id.* (citing Exhibit E, 00:11-00:12).

Approximately 5 seconds later, Mr. Alirez says the following:  "Cristal. Cristal. Say something or I am going to kill you, b****."  *Id.* (citing Exhibit, 00:16-00:21).  Approximately 8 seconds later, Ms. Cervantes states "I can't feel my face." *Id.*  (citing Exhibit E, 00:23-00:25). Mr. Alirez immediately demands an apology and threatens: "or I'm gonna shoot you in the face!" *Id.* (citing Exhibit E, 00:25-00:29).  However, approximately 5 seconds later, Mr. Alirez

provides an apology of sorts: "I'm sorry Cristal, but I'm killing you, fool." *Id.* at 9 (citing

Exhibit E, 00:34-00:36).

From approximately 11 seconds later, the video shows Ms. Cervantes lying on a bed in

apparent pain. *Id.* (citing Exhibit D, 00:45-00:50). Ms. Cervantes was shot in the abdomen at

some point during this encounter, as revealed in a subsequent autopsy. *Id.* (citing Office of the

Medical Inspector, Report of Findings, p. 2 (BN 69-103), attached as Exhibit G). The way she is

holding her abdomen in this video supports the conclusion that Mr. Alirez already had shot Ms.

Cervantes in the abdomen prior to the initiation of the live stream at approximately 3:01 p.m. *Id.*

(citing Exhibit E, 00:47-00:50). Starting at approximately the 00:50 seconds mark, the video

reveals Mr. Alirez raising his handgun and pointing the muzzle of the gun in the direction of Ms.

Cervantes' head. *Id.* (citing Exhibit E, 00:50-00:56). Approximately six seconds later, the video

shows Mr. Alirez fire a round at Ms. Cervantes' head, shows her head move, and shows blood

splattering on the wall. *Id.* (citing Exhibit E, 00:56). The subsequent autopsy revealed that the

shot to the head likely produced the fatal wound. *Id.* (citing Exhibit G, pp. 1-3 (indicating at p.

2: "the wound to the head caused the most significant damage, including skull fractures and

bleeding and injury to the brain [while] the other wounds caused minor injuries").

Although plaintiffs indicate an intention to dispute which specific numbered shot in the

live stream corresponds to which over all shot fired, the parties do not dispute that at

approximately 03:02 p.m., at 01:08 seconds into live stream, Mr. Alirez fires another shot. *Id.* at

10 (citing Exhibit E, 01:08); (Doc. 56) at 7, UMF 45. Approximately fifteen seconds later, the

live stream reveals him firing another shot, still at approximately 03:02 p.m. (Doc. 40) at 10

(citing Exhibit E, 01:23); (Doc. 56) at 7, UMF 46. The parties do not dispute that at

approximately 2:44 mark of the live stream video, Mr. Alirez fires another shot, and yet another

shot at the 2:56 mark of the live stream video. (Doc. 40) at 10 (citing Exhibit E, 02:44, 02:56);
(Doc. 56) at 7-8, UMF 48-49.

Beginning at approximately 2:16 mark of the live stream (3:04 p.m.), the video shows the
motionless figure of Victor Cervantes, Ms. Cervantes' grandfather who lived in the residence.
(Doc. 40) at 10 (citing Exhibit E, 02:16-02:27).  At the 12:21 mark of the live stream, Mr. Alirez
states that he already has killed Victor Cervantes.  *Id.* (citing Exhibit E, 12:21-12:24).

Beginning at approximately the 3:11 mark of the live stream video (3:04 p.m.), Mr.
Alirez states: "Oh F***, I blew her eye out dog!"  *Id.* (citing Exhibit E, 3:11-3:14).  At
approximately the 5:28 mark of the live stream video (about 3:06 p.m.), the video's soundtrack
reveals Mr. Alirez firing his gun again.  *Id.* at 11 (citing Exhibit E, 05:28).  Beginning at
approximately the 12:10 mark of the live stream video (3:09 p.m.), Mr. Alirez states that Ms.
Cervantes is alive, and the video shows her breathing and making noises.  *Id.* (citing Exhibit E,
12:10-12:20).  At approximately the 18:35 mark of the live stream video (between about 3:19
p.m. to 3:21 p.m.), the video soundtrack reveals another firing of the gun.  *Id.* (citing Exhibit E,
18:35).  At approximately the 27:54 mark of the live stream video (about 3:28-3:30 p.m.), the
video shows Mr. Alirez firing his gun at the police.  *Id.* (citing Exhibit E, 27:54).

Beginning at approximately the 28:10 mark of the live stream video (3:29 p.m.), Mr.
Alirez indicates that Ms. Cervantes still is alive, he had shot her in the stomach, and he focuses
his phone on her, with the video revealing her labored breathing.  *Id.* (citing Exhibit E, 28:10-
28:38).  Beginning at approximately the 30:48 mark of the live stream video (3:31 p.m.), Mr.
Alirez states: "you can still hear her."  *Id.* (citing Exhibit E, 30:48-30:52).  Beginning at
approximately the 38:03 mark of the live stream video (3:39 p.m.), Mr. Alirez indicates that Ms.
Cervantes still is breathing.  *Id.* (citing Exhibit E, 38:03-38:06).  At approximately the 50:52

mark of the live stream video (3:50 p.m.), Mr. Alirez' Facebook live stream ends. *Id.* (citing Exhibit E, 50:52).

At an undetermined time after 3:08 p.m., Las Vegas Police Department ("LVPD") Sgt. Elias Rael located the Facebook live stream of Mr. Alirez. *Id.* He informed SMCSO Undersheriff Mike Padilla that Ms. Cervantes still was alive and he left his body camera there to record the live stream, and left his unit with his assault rifle. *Id.* at 11-12 (citing NMSP Case# 20-23-1-0049 LVPD AXON Body Video 2020-11-08(1)(PR 542), 00:49-04:20, 04:21-42:32 (where live stream stops), Exhibit H; NMSP Case# 20-23-1-0049 LVPD AXON Body Video 2020-11-08(2)(PR 543), 00:05-12:19, Exhibit I).

At approximately 4:06 p.m., Sgt. Mark Lucero arrived at 409 Peggy Lee Lane. *Id.* at 12 (citing Second Amended Complaint, ¶ 58 (Doc. 19)). There is no evidence showing Sgt. Lucero arriving on the scene before Ms. Cervantes was shot fatally. *Id.*

At approximately 15:38 hrs. (3:38 p.m.), NMSP Northern Dispatch Center dispatched Officer Miguel Sena to respond to 904 Peggy Lee Lane. *Id.* (citing Second Amended Complaint, (Doc. 19) at ¶ 95). There is no evidence showing Officer Sena arrived on the scene before Ms. Cervantes was shot fatally. *Id.*

At approximately 3:03 p.m., Officer Pretlow was on duty in San Miguel County. *Id.* Upon hearing a report that the SMCSO called "shots fired," Officer Pretlow assigned himself to assist with this incident and arrived at approximately 3:14 p.m. *Id.* (citing Second Amended Complaint, (Doc. 19) at ¶ 33). There is no evidence showing Officer Pretlow arriving on the scene before Mr. Cervantes was shot fatally. *Id.* at 13.

At approximately 4:03 p.m., NMSP North Communications dispatched Officer Adam Vigil to proceed to 409 Peggy Lee Lane in reference to a shooting. *Id.* He arrived on the scene

at approximately 4:04 p.m.  *Id.*  There is no evidence showing Officer Vigil arriving on the scene prior to Ms. Cervantes being shot fatally.  *Id.*

At approximately 2:58 p.m., Officer Ronald Duran responded to a shots fired call at 409 Peggy Lee Lane. *Id.* (citing Second Amended Complaint, (Doc. 19) at ¶ 41).  Officer Duran arrived on the scene at approximately 3:20 p.m.  *Id.* (citing Second Amended Complaint, (Doc. 19) at ¶ 41).  There is no evidence showing Officer Duran arriving on the scene prior to Ms. Cervantes being shot fatally.  *Id.*

Based on the request made by NMSP Sergeant Mark Lucero, the NMSP Tactical Team was activated at 15:26:36 (3:26 p.m.).  *Id.* (citing Exhibit A, p. 1).  There is no evidence demonstrating that the NMSP Tactical Team was activated before Ms. Cervantes was shot fatally.  *Id.* at 14.

The first NMSP Tactical Team officer arrived at Peggy Lee Lane at 15:39:00 (3:39 p.m.).  *Id.* (citing Exhibit A, p. 2).  Although Plaintiffs dispute this fact, as noted by state defendants, their "response to DMF No. 77 is nothing more than counsel's unsupported interpretation of the abbreviation 'DP' used in the I/Net Dispatcher: The Event Chronology [without offering] evidence supporting their interpretation." (Doc. 70) at 8, UMF 77 (citations omitted); (Doc. 56) at 10.  This Court concludes that for purposes of this Motion, this fact is undisputed as a matter of law.  *See GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200–01 (10th Cir. 2022) (citations omitted) (nonmoving party cannot rely upon conclusory allegations, contentions of counsel, speculation, suspicion, or conjecture to defeat summary judgment).  Plaintiffs' counsel's speculation is insufficient to create a genuine dispute.

Defendant, NMSP Tactical Team Lieutenant Hugo Munoz, arrived at the scene at 17:36:53 (5:36 p.m.).  (Doc. 40) at 14 (citing Exhibit A, p. 10).  Although plaintiffs attempt to

dispute this fact based on the same unsupported speculation of counsel, again, such speculation is

insufficient to create a genuine dispute. (Doc. 56) at 10. The parties agree that there is no

evidence showing that Lt. Munoz arrived on the scene before Ms. Cervantes died. (Doc. 40) at

14.

At approximately 3:25 p.m., Tactical Team Lt. Munoz directed the NMSP Tactical Team

to respond to "an armed barricaded subject currently firing rounds at officers" in Las Vegas. *Id.*

at 14-15 (citing NMSP Case #20-23-1-0049-2020-23735 – Supplemental No. 14 – Attachment-

S1-TM-20-111 Supplemental No. 1 (PR 432-PR 435), p. 2, attached as Exhibit J, (Doc. 40-5)).

After activating the NMSP Tactical Team, Crisis Negotiation Team ("CNT"), and Explosive

Ordinance Disposal ("EOD") Units, Lt. Munoz requested assistance from the Albuquerque

Police Department SWAT team because a majority of the NMSP Tactical Team was in

Farmington prepping for a warrant service. *Id.* at 15 (citing Exhibit J, p. 2).

While on route to the scene, the Tactical Team officers learned that Mr. Alirez was live

streaming himself on Facebook Live. *Id.* (citing Exhibit J, p. 2). Although plaintiffs purportedly

dispute that the entire team learned of this, plaintiffs offer no evidence to support any other

interpretation. (Doc. 56) at 10, UMF 82-84. Furthermore, they do not dispute that Mr. Alirez

was claiming that he had shot a female (Ms. Cervantes) in the stomach, nor do they dispute that

NMSP Lt. Bobnock located the live stream and provided "the team" with an update that Mr.

Alirez shot the female in the head. *Id.*; (Doc. 40) at 15 (citing Exhibit J, p. 2). There is no

genuine dispute regarding a material fact here.

NMSP Crisis Negotiators were able to contact Mr. Alirez on the phone. (Doc. 40) at 15

(citing Exhibit J, p. 2). Mr. Alirez stated that all the people inside were dead. *Id.* (citing Exhibit

J, p. 2). However, the team members were unable to confirm that all persons inside were dead as

Mr. Alirez had claimed. *Id.* (citing Exhibit J, p. 2). The video only showed Mr. Alirez shooting Ms. Cervantes. *Id.* (citing Exhibit J, p. 2).

While the Tactical Team was setting up, CNT informed the Tactical Team that Mr. Alirez fired another round out of the house and made statements that he was going to come out shooting because he only had a few rounds left for cops. *Id.* (citing Exhibit J, p. 2). Again, although plaintiffs purport to dispute whether CNT informed the entire team or simply the sergeant who authored the report documenting the incident, plaintiffs offer no evidence in rebuttal. There is no genuine dispute about a material fact.

The parties do not dispute that Mr. Alirez also informed CNT that he had artillery shells. *Id.* at 16 (citing Exhibit J, p. 2). Tactical Team Sgt. Jonathan Tenorio directed the Tactical Team to develop a chemical munitions plan. *Id.* (citing Exhibit J, p. 2). Although plaintiffs purport to create a dispute regarding the identity of the individual who directed the Tactical Team to develop a chemical munitions plan, they do not offer any counter evidence or counter interpretation. (Doc. 56) at 11, UMF 91. They also do not indicate the relevance, that is, how the fact is material. Again, this Court concludes there is no genuine dispute regarding any material fact.

Chemical munitions were deployed to disorient Mr. Alirez and potentially force him to exit the residence. (Doc. 40) at 16 (citing Exhibit J, p. 2). After chemical munitions were deployed, CNT advised that Mr. Alirez was still on the phone and sounded like he was wearing a gas mask. *Id.* (citing Exhibit J, p. 2). Mr. Alirez told CNT that he would be exiting out the back door. *Id.* (citing Exhibit J, p. 2). At approximately 5:26 p.m., uniform officers apprehended Mr. Alirez when he exited the back door. *Id.* (citing Exhibit J, p. 2; Exhibit A, p. 10).

Tactical Team members subsequently made entry through the back door Mr. Alirez utilized to exit. *Id.* (citing Exhibit J, p. 2). Entry officers found an unresponsive male and female inside the residence, both with apparent gunshot wounds. *Id.* (citing Exhibit J, p. 2).

On November 8, 2020, at 10:00 p.m., NMSP Agent Kevin Keiner completed an Affidavit for Arrest Warrant for Mr. Alirez, setting forth the factual basis justifying his arrest for the murder of Ms. Cervantes, among other charges. *Id.* (citing Affidavit for Arrest Warrant, attached as Exhibit K (Doc. 40-6)). On November 8, 2020, New Mexico Magistrate Judge Christian E. Montaño issued an Arrest Warrant for Mr. Alirez with a "no bond hold." *Id.* at 17 (citing Arrest Warrant, attached as Exhibit L (Doc. 40-7)). On November 9, 2020, NMSP Agent Kevin Keiner filed a Criminal Complaint, charging Mr. Alirez with the murder of Ms. Cervantes, among other charges. *Id.* (citing Docket for State of New Mexico v. Alejandro Alirez, M-48-FR-2020-00359, attached as Exhibit M (Doc. 40-8)).

B. *Procedural History*

Angel Salcido, personal representative of the wrongful death estate of Cristal Cervantes, and Wanda Martinez, ("plaintiffs"), filed a complaint against state defendants that was removed to this Court on December 29, 2021. (Doc. 1). As relevant for this Motion, plaintiffs allege a Constitutional substantive Due Process violation against state defendants via Section 1983. U.S. Const. amend XIV; 42 U.S.C. § 1983. (Doc. 19 (amended complaint, Count I)) at ¶¶ 67-138 (Doc. 57) at 11-20. On May 2, 2022, state defendants filed the Motion for Summary Judgment of the Due Process claim, which, is fully briefed. (Doc. 41).

II.    *Standards of Law*

    A. *Summary Judgment*

Summary judgment should be granted if the movant establishes that there is no genuine dispute of material fact "and that the movant is entitled to judgment as a matter of law." *Sawyers v. Norton*, 962 F.3d 1270, 1282 (10th Cir. 2020) (quoting Fed. R. Civ. P. 56(a)).  A fact is considered material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Id.*

The parties must support factual allegations with evidence and the Court is free to consider materials such as depositions, documents, and affidavits.  Fed. R. Civ. P. 56(c)(1)(A). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant meets this burden, the nonmovant is required to put in the record facts showing that there is a genuine issue for trial.  *Anderson*, 477 U.S. at 248. In applying this standard, the Court resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant.  *See Hunt v. Cromartie*, 526 U.S. 541, 551–52 (1999) (quoting *Anderson*, 477 U.S. at 255).  However, the nonmoving party cannot rely upon conclusory allegations, contentions of counsel, speculation, suspicion, or conjecture to defeat summary judgment.  *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988) (citations omitted); *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200–01 (10th Cir. 2022) (citations omitted).  A "plaintiff's version of the facts must find support in the

record." *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011) (citation omitted).

"Unsubstantiated allegations carry no probative weight in summary judgment proceedings."

*GeoMetWatch Corp.*, 38 F.4th at 1200 (quoting *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092,

1098 (10th Cir. 2019)).

    *B.  Qualified Immunity*

    Section 1983 of Title 42 authorizes a private cause of action against any person acting

under color of state law for "the deprivation of any rights, privileges, or immunities secured by

the Constitution." 42 U.S.C. § 1983.  Individual defendants named in a § 1983 action, however,

"may raise a defense of qualified immunity[.]". *Irizarry v. Yehia*, 38 F.4th 1282, 1287 (10th Cir.

2022) (quoting *Est. of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014)).  Qualified

immunity "creates a presumption that the defendant is immune from suit." *Truman v. Orem*

*City*, 1 F.4th 1227, 1235 (10th Cir. 2021) (quoting *Est. of Smart by Smart v. City of Wichita*, 951

F.3d 1161, 1168 (10th Cir. 2020)).  To overcome this presumption, a plaintiff bears a heavy

burden to show both (1) that "the defendant's actions violated a constitutional or statutory right

and (2) that right was clearly established at the time of the defendant's complained-of conduct."

*Irizarry*, 38 F.4th at 1287-88 (quoting *Truman*, 1 F.4th at 1235).

    If the plaintiff fails to satisfy either prong of the qualified immunity test, the court must

grant qualified immunity and summary judgment. *McCowan v. Morales*, 945 F.3d 1276, 1282

(10th Cir. 2019) (quoting *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1212–13 (10th Cir. 2019)).

"In short, although we will review the evidence in the light most favorable to the nonmoving

party, the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden;

otherwise, the defendants are entitled to qualified immunity." *Medina v. Cram*, 252 F.3d 1124,

1128 (10th Cir. 2001) (internal citation omitted).

A plaintiff "must 'produce facts sufficient to show both that the defendant's alleged conduct violated the law and that that law was clearly established when the alleged violation occurred'" to overcome the presumption that a defendant is protected by qualified immunity. *Bruning v. Pixler*, 949 F.2d 352, 356 (10th Cir. 1991) (quoting *Pueblo Neighborhood Health Ctrs., Inc.*, 847 F.2d at 646). Only if the plaintiff meets this burden does the defendant "bear the usual summary judgment movant's 'burden of showing that no material issues of fact remain that'" defeat the claim of qualified immunity. *Id.* (quoting *Pueblo Neighborhood Health Ctrs., Inc.*, 847 F.2d at 646); *see also Koch*, 660 F.3d at 1238.

III.   *Fourteenth Amendment Substantive Due Process*

Plaintiffs allege a Constitutional substantive Due Process violation against state defendants under 42 U.S.C. § 1983. U.S. Const. amend XIV. (Doc. 19 (amended complaint, Count I)) at ¶¶ 67-138 (Doc. 57) at 11-20. State defendants contend that as a matter of law they did not violate Ms. Cervantes' Fourteenth Amendment substantive Due Process right because they did not have a special relationship with her and they did not create the danger resulting in her shooting and death. (Doc. 41) at 3. State defendants also contend that they did not act or fail to act in any way that shocked the conscience; and, in the alternative, did not violate any clearly established Fourteenth Amendment law. *Id.* at 4. This Court finds Defendants' arguments persuasive.

A. *Due Process claims*

Plaintiffs claim violation of Ms. Cervantes' Fourteenth Amendment substantive Due Process right "to be free from a government employee affirmatively placing her in a position of actual, particularized danger." (Doc. 19) at ¶ 103. Plaintiffs also claim violation of Ms. Cervantes' Fourteenth Amendment substantive due process rights through the failure by all

defendants to investigate competently and to take all appropriate actions regarding the known and foreseeable criminal violations by Mr. Alirez. *Id.* at ¶ 70. Finally, as relevant to this claim and Motion, plaintiffs allege that state defendants "committed an affirmative act" when they did not "competently investigate and take appropriate action on known and foreseeable criminal violations of law of third parties" and "by failing to evaluate properly the particular on-going vulnerability to Cristal Cervantes, to impose any command or control over the scene, to devise a tactical plan and communicate to officers on scene and between Defendant agencies, and other necessary and reasonable actions designed to avoid preventable injury or death, in response to the known danger presented to Cristal Cervantes." *Id.* at ¶ 104.

B. *Due Process Analysis*

1. *Lack of Exceptional Circumstances*

This Court summarizes plaintiffs' Due Process claims noted above as alleging that defendants failed to act appropriately, and Ms. Cervantes died as a result. *See id.* at ¶¶ 70, 103-04. In contrast to plaintiffs' position, and despite the unquestioned tragic nature of the events, plaintiffs acknowledge the general rule that "state officials are not liable for acts of private violence." (Doc. 57) at 15 (citing *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989)). However, plaintiffs argue that an exception applies to this matter, that being, a state official may be liable when such state actor "affirmatively acts to create, or increase a plaintiff's vulnerability to, danger from private violence." *Id.* (citing *T.D. v. Patton*, 868 F.3d 1209, 1221 (10th Cir. 2017) (quoting *Currier v. Doran*, 242 F.3d 905, 923 (2001) (citing *Uhlrig v. Harder*, 64 F.3d 567, 572 & n.1 (10th Cir. 1995)))).

a. *Creation of the danger*

16

Plaintiffs note that under the danger-creation theory, they must show that a state actor "affirmatively acted to create or increase a plaintiff's vulnerability to, danger from private violence." *Id.* at 16 (citing *Currier*, 242 F.3d at 923).  Plaintiffs seeking to hold state actors liable for private violence also must demonstrate:

> (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way;
> (2) plaintiff was a member of a limited and specifically definable group;
> (3) defendant's conduct put plaintiff at substantial risk of serious, immediate, and proximate harm;
> (4) the risk was obvious or known;
> (5) defendants acted recklessly in conscious disregard of that risk; and
> (6) such conduct, when viewed in total, is conscience shocking.

*Id.* (quoting *TD v. Patton*, 868 F.3d 1209, 1222 (10th Cir. 2017) (quoting *Currier*, 242 F.3d at 918)).

Plaintiffs contend that defendants "affirmatively acted to create or increase Christal Cervantes' vulnerability to danger from private violence." *Id.*  Plaintiffs contend that the affirmative action consists of state defendants' taking "command of the situation despite not having all team members available for an immediate rescue..." *Id.* (citation omitted).  Plaintiffs do not explain how taking command despite the unavailability of some team members created or increased any risk to Christal Cervantes' vulnerability to danger.  Although the lack of available units to act more promptly is regrettable, plaintiffs are attempting to hold state defendants liable for failing to take actions, not for acting affirmatively.  Similarly, although plaintiffs discuss facts regarding the NMSP teams' arrival and negotiation with Mr. Alirez, and his subsequent exit, plaintiffs do not connect logically any of the actual actions of a team member or officer with any creation or increase in Christal Cervantes' vulnerability to danger.  *See id.* at 16-18.  They also do not cite any caselaw with similar facts found to be a Due Process violation of rights such that the state actors would have been put on notice that their behavior was actionable and

improper.  In contrast, in their reply, state defendants analogize the factual situation with that

presented in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 197

(1989).  (Doc. 71) at 5-7 (also citing *Gray v. University of Colorado Hospital Authority*, 672

F.3d 909, 916 (10th Cir. 2012)).

      In *DeShaney*, a child was alleging that social services deprived him of his substantive

Due Process rights "by failing to intervene to protect him against a risk of violence at his father's

hands of which they knew or should have known."  489 U.S. at 193.  As noted by state

defendants, the Court instead concluded that a state's failure to protect an individual "against

private violence simply does not constitute a violation of the Due Process Clause."  *Id*. at 197.

The relevant state actors in *DeShaney* even had proclaimed specifically "by word and by deed,"

the intention to protect the child from the danger from his father and such affirmative

proclamation still was insufficient to allow liability against the state.  *Id*.  State defendants also

note the conclusion of the Tenth Circuit that "inaction by the state in the face of a known danger

is not enough to trigger the obligation" to protect a plaintiff from a third party's harm. *Gray*, 672

F.3d at 916 (quotation marks and other citation omitted).  Plaintiffs have not alleged any actions

by any state defendants implicating substantive Due Process rights based on the unfortunate

death of Christal Cervantes: the inability to act sooner or take more efficacious actions is

regrettable, but not actionable against state defendants.  As all factors of the test must be met for

plaintiffs to hold state defendants liable, failure to allege properly affirmative action by state

defendants that created or increased the danger to Ms. Cervantes is dispositive and fatal to

plaintiffs' Due Process claim against state defendants.  *See Patton*, 868 F.3d at 1222 (discussing

factors for exception to the general rule of no state liability for third-party violence) (quoting

*Currier*, 242 F.3d at 918).

In addition, plaintiffs also cannot meet the final factor that must be met for plaintiffs to overcome the general rule that a state is not liable for a private actor's violence, that is, conscience shocking behavior. *See id.* For behavior to reach the level of shocking the conscience, it must have an element of the outrageous, the truly conscience shocking. *Id.* (citation omitted); *Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1222-23 (10th Cir. 2006). For example, "a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." *Camuglia*, 448 F.3d at 1222 (quoting *Moore v. Guthrie*, 238 F.3d 1036, 1040 (10th Cir. 2006)).

Plaintiffs argue that the facts presented in this case entail conduct that is more than negligent, less than intentional, and satisfies the conscience-shocking standard. (Doc. 57) at 18-19 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998) (other citations omitted). Plaintiffs note that the "length of deliberation and deference to local policy-making bodies are factors in the conscience-shocking analysis." *Id.* at 19 (citing *Green v. Post*, 574 F.3d 1294, 1300, 1303 (10th Cir. 2009)). Plaintiffs also note that state officials can be held liable when it is demonstrated they were subjectively aware of a substantial risk of serious harm to a plaintiff and they have the opportunity for "reflection and unhurried judgments." *Id.* (citing *Green*, 574 F.3d at 1303) (citations to out of circuit authority omitted). This Court takes these factors into consideration.

In response to state defendants' Motion and assertion that their behavior did not shock the conscience, plaintiffs assert facts supporting their position that state defendants' behavior "was certainly egregious and outrageous rising to the level of shocking the conscience." (Doc. 57) at 20. Plaintiffs note that although NMSP Teams were activated by 3:26 p.m., "neither team actually departed towards 409 Peggy Lane until 3:39 p.m. and 3:50 p.m." *Id.* at 19 (citing UMF

19

¶¶ 25, 27-28, 36, 38).  Plaintiffs contend that although NMSP was aware through the Facebook live stream that Ms. Cervantes had been shot, they monitored the live stream, "but chose not to act."  *Id.* at 19-20.  Plaintiffs complain that it was only after the live stream ended that authorization was provided to shoot Mr. Alirez.  *Id.* at 20 (citing UMF ¶ 40).  Plaintiffs object because CMT officers were talking to Mr. Alirez, but "not reporting back to the officers at the scene that Cristal is still alive."  *Id.* at 20.  Plaintiffs stringently object to a CMT officer telling officers on the scene that it was their job to get Mr. Alirez out of the residence safely.  *Id.* (citing UMF ¶ 46).  Plaintiffs specifically complain regarding a wait time of approximately thirty five minutes for the Las Vegas Police Department to bring the NMSP a Mine-Resistant Ambush Protected unit.  *Id.*  The NMSP delays entry after CMT tells them that Mr. Alirez is going to exit, which he subsequently does at 5:24 p.m.  *Id.* (citing UMF ¶¶ 48, 50-51).  Plaintiffs complain about the "two hours of time" state defendants had to reflect continuously "about if they were doing enough to decrease her vulnerability to private violence."  *Id.*

Plaintiffs' frustrations regarding this emotionally disturbing event are very understandable.  However, although it is possible state defendants did not act perfectly, none of the alleged actions or inactions, individually or in total, in the context as presented by plaintiffs, rise to the level of shocking to the conscience.  Based on a review of the undisputed facts and all disputed facts resolved in favor of plaintiffs, this Court concludes that as a matter of law, state defendants' behavior in total (and regarding the actions noted and alleged by plaintiffs) could not be found by any reasonable jury to shock the conscience and are not shocking to the judicial conscience.  Although the entire event, including the violent actions of Mr. Alirez, is shocking and regrettable, state defendants' behavior could not shock the conscience of any reasonable set of jurors.  Therefore, this conclusion of law provides an alternative basis for this Court to grant

state defendants' partial motion for summary judgment on the Due Process claims.  For this independent reason, plaintiffs' Due Process claims against the state defendants fails and state defendants' Motion on this claim shall be granted.

### b.  Lack of special relationship

State defendants correctly note in their reply that plaintiffs did not present any argument or allege any facts supporting the other potential exception to the general rule that a state is not liable for violent actions by a private party, that is, when there is the existence of a special relationship with a state.  (Doc. 71) at 5; *see also* (Doc. 41) at 9-11 (arguing state defendants did not have a special or custodial relationship with Ms. Cervantes because she was not incarcerated, institutionalized, or in state custody at the time of her shooting and death) (citing *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1280 (10th Cir. 2003)).  Not only is this exception waived, but also, this Court concludes as a matter of law that there is no special relationship alleged that can provide the basis for this exception to the general rule that a state is not liable for violent actions by a private party.

### 2.  No Clearly Established Violation

In the alternative, state defendants contend that "the individually named New Mexico State Police officers' actions and inactions did not violate clearly established Fourteenth Amendment law, and therefore, the NMSP officers are entitled to qualified immunity."  (Doc. 41) at 16.  For the reasons discussed below, this Court is persuaded by state defendants' argument.  This conclusion provides an alternative basis to grant the partial motion for summary judgment and dismiss the Due Process claim against state defendants.

A right is clearly established "when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must

be as the plaintiff maintains." *Truman*, 1 F.4th at 1235 (quoting *Thomas*, 765 F.3d at 1194).
"The salient question is whether the state of the law at the time of an incident provided 'fair
warning' to the defendants that their alleged conduct was unconstitutional." *Reavis Estate of
Coale v. Frost*, 967 F.3d 978, 992 (10th Cir. 2020) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656
(2014)) (other citations and alterations omitted).  Put another way, the Tenth Circuit asks,
"whether the contours of a right are sufficiently clear that every reasonable official would have
understood that what he is doing violates that right." *Halley v. Huckaby*, 903 F.3d 1136, 1156
(10th Cir. 2018) (citations and internal quotation marks omitted).

Clearly established law "must remain moored in a specific set of facts" to show that the
"violative nature of *particular* conduct is clearly established." *Crane v. Utah Dep't of Corr.*, 15
F.4th 1296, 1303 (10th Cir. 2021) (citation omitted).  To that end, the Supreme Court has
repeatedly instructed courts "not to define clearly established law at too high a level of
generality." *City of Tahlequah v. Bond*, 142 S.Ct. 9, 11, 21WL 4822664 (2021) (citing *Ashcroft
v. al-Kidd*, 563 U. S. 731, 742 (2011)).  Notably, plaintiff bears the burden of citing to the Court
what plaintiff thinks constitutes clearly established law. *Crane*, 15 F.4th at 1303 (quoting
*Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010)).  As discussed further herein,
plaintiffs have failed to meet this burden.

Plaintiffs, when arguing that Cristal Cervantes' substantive Due Process rights as
presented in their complaint were clearly established at the time of state defendants' behavior,
rely on *Lewis*: "When governmental officials face a situation 'calling for fast action,' only official
conduct done with an intent to harm violates the Fourteenth Amendment."  (Doc. 57) at 14
(quoting *Lewis v. County of Sacramento*, 523 U.S. 833, 850 (1998)).  This Court first concludes
that *Lewis* is distinguishable, as in *Lewis*, the police officer killed a passenger of a vehicle the

22

officer was pursuing in a high-speed chase.  *See id.* (discussing facts of *Lewis*); *see also Lewis*,

523 U.S. at 837.  Plaintiffs, however, distinguish *Lewis* on a different basis: "The Court focused

its analysis on the fact that the officer's reaction was 'instinctive' behavior arising from a high-

speed pursuit."  (Doc. 57) at 14 (citing *Lewis*, 523 U.S. at 836).  Plaintiffs find support from

*Lewis* in that "the Court in *Lewis* acknowledged that there are situations in which an officer has

time to engage in actual deliberation before taking an action and therefore, in those situations

where actual deliberation is practical, the Courts should apply a deliberate indifference standard

in evaluating violations of Due Process rights."  *Id.* (citing *Lewis*, 523 U.S. at 851).  Plaintiffs

continue: "when a government official has enough time to engage in 'actual deliberation,'

conduct that shows 'deliberate indifference' to a person's life or security will shock the

conscience and thereby violates the Fourteenth Amendment."  *Id.* (citing *Perez v. Unified Gov't*

*of Wyandotte County/Kansas City*, 432 F.3d 1163 (10th Cir. 2005)).  However, even assuming the

less than three hours state officers had here is sufficient time for actual deliberation, and even

applying the standard as presented by plaintiffs, this Court concludes that the facts as undisputed

or alleged properly and interpreted in plaintiffs' favor still cannot be found by any reasonable

jury to entail deliberate indifference to Cristal Cervantes' life or security.  Plaintiffs acknowledge

that in *Green*, the Tenth Circuit concluded that "this middle level of culpability encompasses

conscious, deliberate indifference to an extreme risk of very serious harm to plaintiff."  *Id.*

(citing *Green*, 574 F.3d at 1303).  This Court already has discussed the undisputed material facts

as well as the facts specifically alleged by plaintiffs in their response to state defendants' Motion,

*see supra*.  As a matter of law, when interpreted in favor of plaintiffs, these facts cannot be

interpreted by any reasonable jury to be a violation of clearly established law via deliberate

indifference.  Plaintiffs have not cited a single case on point with these facts that could have put officers on notice their conduct entailed a Constitutional violation.

Plaintiffs have not been able to cite any case law even close to being on point such that a reasonable officer would have been on notice that the behavior described herein violated clearly established Fourteenth Amendment law.   In contrast, state defendants provide multiple cases where the Supreme Court or Tenth Circuit Court of Appeals concluded that facts similar to those alleged herein did not entail Due Process violations.  (Doc. 41) at 17-25 (citing *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748 (2005) (no Due Process violation where the police delayed searching for a wife/mother's children when she requested police action and failed to enforce adequately a restraining order against her husband who subsequently killed the children); *Martinez v. Uhhoff*, 265 F.3d 1130, 1132 (10th Cir. 2001) (no Due Process violation where the widow of a corrections officer sued the Department of Corrections and others with allegations of deliberate failure to ensure proper training and supervision of penitentiary personnel and other failures allegedly resulting in his murder by three inmates executing an escape); *Uhlrig v. Harder*, 64 F.3d 567 (10th Cir. 1995) (no Due Process violation where closure of a special unit allegedly made more vulnerable an employee subsequently murdered by an inmate).

This Court concludes that plaintiffs have not alleged a violation of a right that is clearly established or that any violation would be obvious to a reasonable officer based on the undisputed facts or facts that plaintiffs have alleged and emphasized in response to the Motion. Based on state defendants' alternative argument, this Court concludes for this reason, too, state defendants' Motion should be granted as to plaintiffs' Due Process claim.

IV. Conclusion

For the reasons discussed, this Court concludes that the behavior of state defendants did not create the danger suffered nor increase the vulnerability of the victim to the danger and was not behavior shocking to the conscience.  In the alternative, the NMSP officers are entitled to qualified immunity because plaintiffs have not alleged a violation of a right that is clearly established.  Therefore, this Court grants in part state defendants' Motion for Partial Summary Judgment (No. II) on the Fourteenth Amendment substantive Due Process Claim Based on the Application of Qualified Immunity:

1) State defendants' Motion for Partial Summary Judgment (No. II) on the Fourteenth Amendment substantive Due Process Claim Based on the Application of Qualified Immunity is granted in part.

2) The Fourteenth Amendment substantive Due Process Claim against state defendants is dismissed with prejudice; and,

3) as state defendants' do not support their request for attorney's fees (or costs) with any citation or statutory authority, this portion of their Motion is denied.

IT IS SO ORDERED.

UNITED STATES DISTRICT JUDGE