IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ANGEL SALCIDO, personal representative of THE
WRONGFUL DEATH ESTATE OF CRISTAL
CERVANTES, WANDA MARTINEZ,

    Plaintiffs,

vs.                                                                                                   Civ. No. 21-01222 KG/JHR

CITY OF LAS VEGAS, LAS VEGAS POLICE
DEPARTMENT, CHIEF ADRIAN CRESPIN,
SGT. ELIAS RAEL, SAN MIGUEL COUNTY, SAN MIGUEL
COUNTY SHERIFF'S OFFICE, UNDERSHERIFF MIKE
PADILLA, DEPUTY JAYME VIGIL, NEW MEXICO
DEPARTMENT OF PUBLIC SAFETY,
NEW MEXICO STATE POLICE, JOHN DOE 1,
LT. HUGO MUNOZ, SGT. MARK LUCERO,
PATROLMAN MIGUEL SENA,

    Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before this Court on a Motion for Partial Summary Judgment (No. I) by Defendants San Miguel County, San Miguel County Sheriff's Office, Undersheriff Mike Padilla, and Deputy Jayme Vigil (collectively "County Defendants"). (Doc. 87). The Motion is fully and timely briefed. *See* (Docs. 87, 101, 104).

As discussed in previous memorandum opinion and orders, the facts giving rise to this case concern an exceedingly unfortunate and regrettable violent murder. The second-guessing of the officers' actions and inactions by those who have suffered egregious loss is understandable. However, this Court must apply the general rule that a county is not liable for the violent actions of private individuals because neither the county nor its officers created the danger suffered or

increased the vulnerability of the victim to the danger. In addition, although everyone wishes earlier efficacious action could have prevented the violence, the fact remains that none of the actions or inactions by the county or its officers shocks the conscience. As a result, Plaintiffs' Due Process claims against County Defendants must be dismissed.

I. *Background*

    A. *Factual Background*

Nearly all the facts discussed below have been previously discussed in this Court's earlier Memorandum Opinions and Orders. Nonetheless, the Court recounts many of these tragic facts. These following facts are either undisputed or interpreted favorably towards non-moving Plaintiffs for purposes of this Motion, unless otherwise noted.

On Sunday, November 8, 2020, sometime before 3:00 p.m., San Miguel County Sheriff's Office (SMCSO) Deputy Jayme Vigil was on patrol, traveling on Collins Drive in Las Vegas. (Doc. 87) at 4 (citing (Doc. 87-1)). Two individuals, Guillermo Rodriguez and Patricia Baca, flagged down Deputy Vigil and described a phone call Ms. Baca received from Veronica Martinez, the mother of Cristal Cervantes. *Id.* (citing (Doc. 87-1) at 1–2). Ms. Baca told Deputy Vigil that Ms. Cervantes' mother was requesting a welfare check was because Cristal Cervantes called her mother, indicating that Alejandro Alirez, also known as "Tuffy," was at her residence on Peggy Lee Lane and was "irate." *Id.* (citing (Doc. 40-2) at 2). Ms. Baca indicated to Deputy Vigil that Mr. Alirez was mentally ill and possibly psychotic. *Id.* at 5 (citing (Doc. 87-1) at 2). Mr. Rodriguez indicated to Deputy Vigil that Mr. Alirez was armed with a gun. *Id.* (citing (Doc. 87-1), at 3). Deputy Vigil relayed this information to SMCSO Deputy Devin Adkins, whose vehicle was located behind Deputy Vigil's. *Id.* at 6 (citing (Doc. 87-1) at 3). The deputies drove their units to 409 Peggy Lee Lane to conduct a welfare check. *Id.* (citing (Doc. 87-1) at 3). The

deputies parked their marked police vehicles on the street to the left of the residence in clear view. (Doc. 101) at 4; *see* (Doc. 104) at 4.

At approximately 14:59:06, (2:59 PM), Deputies Vigil and Adkins arrived at Ms. Cervantes' residence. (Doc. 87) at 6 (citing (Doc. 87-1) at 2). The deputies walked up to the front door of Ms. Cervantes' residence and Deputy Adkins knocked on the security screen door. *Id.* (citing (Doc. 87-1) at 3). Seconds later, the deputies heard a gunshot and a woman screaming. *Id.* at 7 (citing (Doc. 87-1) at 3). This first gunshot after the deputies' arrival was fired at 14:59:37 (2:59:37 PM). *Id.* (citing (Doc. 79) at 3). Although Deputy Adkins attempted to open the security screen door, it was locked. *Id.* (citing (Doc. 87-1) at 3). When they heard the first shot, the deputies moved from the front to the side of the residence. *Id.* (citing (Doc. 87-1) at 3). As they were making this alteration in position, both deputies called out on the radio "shots fired." *Id.* (citing (Doc. 87-1)) at 3).

After changing their position, the deputies heard three separate gunshots fired from inside the residence. *Id.* at 7–8 (citing (Doc. 87-1) at 3–4). After hearing the three additional rounds, the deputies moved behind Deputy Vigil's vehicle, utilizing it for cover and concealment. *Id.* at 8 (citing (Doc. 87-1) at 4).

Deputy Vigil retrieved her duty rifle from her trunk and utilized the trunk of her marked police vehicle as cover. (Doc. 87) at 8 (citing (Doc. 87-1) at 4). Deputy Atkins positioned himself near the rear driver's side wheel of Deputy Vigil's unit. (Doc. 87) at 8 (citing (Doc. 87-1) at 4). The deputies then heard rounds hitting either Deputy Vigil's or Deputy Atkins' vehicle. *Id.* at 8–9 (citing (Doc. 87-1) at 4–5). Deputy Vigil observed one round causing the front passenger tire to deflate, and informed radio dispatch every time a shot was fired. *Id.* at 9 (citing (Doc. 79) at 4). Although Plaintiffs purport to dispute County Defendants' contention that the

3

gunfire from Mr. Alirez was pinning down the deputies, Plaintiffs do not dispute that the deputies were taking cover and were under fire, but instead note a conversation in which Deputy Vigil's boss tells her to maintain cover and she reports this fact to Deputy Atkins. (Doc. 101) at 2. This is not a genuine dispute regarding a material fact.

At approximately 3:01:37 p.m., Mr. Alirez began live-streaming his actions on Facebook. (Doc. 87) at 10. This Facebook live stream reveals multiple facts, including the following: At approximately 3:02 p.m., the live stream begins capturing Mr. Alirez's actions. *See id.* About eleven seconds in, Mr. Alirez states: "[Ms. Cervantes] is still alive." *Id.* Starting at approximately the 00:50 seconds mark, the video reveals Mr. Alirez raising his handgun and pointing the muzzle of the gun in the direction of Ms. Cervantes' head. *Id.* Approximately six seconds later, the video shows Mr. Alirez fire a round at Ms. Cervantes' head, shows her head move, and shows blood splattering on the wall. *Id.*

The subsequent autopsy revealed that the shot to the head likely produced the fatal wound. *Id.* at 11 (citing (Doc. 40-4) at 2–3 (indicating "the wound to the head caused the most significant damage, including skull fractures and bleeding and injury to the brain [while] the other wounds caused minor injuries"). Plaintiffs dispute that the autopsy is conclusive evidence that Ms. Cervantes was going to die due to the head wound but offer no evidence suggesting otherwise. (Doc. 101) at 2–3. For purposes of this Motion, the Court concludes this fact is undisputed as a matter of law. *See GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200–01 (10th Cir. 2022) (citations omitted) (nonmoving party cannot rely upon conclusory allegations, contentions of counsel, speculation, suspicion, or conjecture to defeat summary judgment). Without any factual support, Plaintiffs' counsel's speculation is insufficient to create a genuine dispute.

4

At approximately 03:02 p.m., at 01:08 seconds into live stream, Mr. Alirez fires another shot. (Doc. 87) at 11. Approximately fifteen seconds later, the live stream reveals him firing another shot, still at approximately 03:02 p.m. *Id.* At about the 2:44 mark of the live stream video, Mr. Alirez fires another shot, and yet another shot at the 2:56 mark of the live stream video. *Id.* Beginning at approximately the 3:11 mark of the live stream video (3:04 p.m.), Mr. Alirez states: "Oh f***, I blew her eye out dog!" *Id.* And at approximately the 5:28 mark of the live stream video (about 3:06 p.m.), the video's soundtrack reveals Mr. Alirez firing his gun again. *Id.* at 12.

Around the 07:38 mark of the live stream (about 3:08 p.m.), Mr. Alirez brandishes his gun and states that he "killed his girl [Ms. Cervantes]." *Id.* at 12 (citing Exhibit E to State Defendants' MPSJ No. 1, 07:38–07:43). Just over a minute later, at the 08:48 mark, Mr. Alirez reappears in the video, stating he "killed them" and "there are two dead people." *Id.* (citing Exhibit E to State Defendants' MPSJ No. 1, 08:48–08:55). He immediately corrects himself and says, "one's still alive," and he then walks over to Ms. Cervantes, puts the camera near her, and records her labored breathing. *Id.* (citing Exhibit E to State Defendants' MPSJ No. 1, 08:55–09:09). Plaintiffs appear to dispute these facts to the extent that they indicate Ms. Cervantes was dead. *See* (Doc. 101) at 3. As Defendants point out, however, these facts, are supported by video evidence. The Court therefore determines these facts are undisputed. That said, Plaintiffs point out that Mr. Alirez continually corrects himself, stating at various times that Ms. Cervantes was alive. *Id.* And County Defendants do not appear to dispute this. *See* (Doc. 104) at 3.

At approximately the 18:35 mark of the live stream (from about 3:19 p.m. to 3:21 p.m.), the video soundtrack reveals another firing of the gun. (Doc. 87) at 12. At approximately the

27:54 mark of the live stream (about 3:28–3:30 p.m.), the video shows Mr. Alirez firing his gun at the police. *Id.* at 13 (citing Exhibit E to State Defendants' MPSJ No. 1, 27:50–27:56).

Nearly ten minutes later, around the 28:10 mark of the live stream video (3:29 p.m.), Mr. Alirez indicates that Ms. Cervantes is still alive, he had shot her in the stomach, and he focuses his phone on her, with the video revealing her labored breathing. (Doc. 101) at 8 (citing Exhibit E to State Defendants' MPSJ No. I, 28:10–28:38). Around the 30:53 mark of the live stream, Mr. Alirez states "she [Ms. Cervantes] is still alive dog, you could hear her but…f*****s they called the cops." *Id.* (citing Exhibit E to State Defendants' MPSJ No. I, 31:00–31:04). Approximately seven minutes later, at the 38:09 mark of the live-stream video (3:39 p.m.), Mr. Alirez indicates that Ms. Cervantes is still breathing. *Id.* (citing Exhibit E to State Defendants' MPSJ No. I, 38:09). At approximately the 50:52 mark of the live stream video (around 3:52 p.m.), Mr. Alirez's Facebook live stream ends. *Id.* at 9 (citing Exhibit E to State Defendants' MPSJ No. I, 50:52).

Undersheriff Padilla was not on duty the afternoon of November 8, 2020. (Doc. 87) at 13. However, he heard Deputy Vigil and Deputy Adkins radio "shots fired." *Id.* Upon hearing this radio transmission, he immediately got in his unit and responded to the intersection of Collins Drive and Peggy Lee Lane, near 409 Peggy Lee Lane. *Id.* Undersheriff Padilla then established a command post at the intersection of Collins Drive and Peggy Lee Lane, knowing that officers from the Las Vegas Police Department (LVPD) and the New Mexico State Police (NMSP) were responding to the incident. *Id.* at 14. He instructed his deputies on scene to maintain a perimeter and remain behind cover because he was concerned that Mr. Alirez would shoot them. *Id.* Based on the situation, Undersheriff Padilla requested assistance from the NMSP tactical team because SMCSO did not have a tactical team, and he knew that NMSP's

tactical team had the advanced training and the tools necessary to address the threat that Mr. Alirez posed to civilians and law enforcement. *Id.* Concerned Mr. Alirez would use deadly force against law enforcement officers or innocent bystanders, Undersheriff Padilla did not order or instruct SMCSO personnel to take any action against Mr. Alirez. *Id.* at 15.

Throughout the remainder of the incident, Undersheriff Padilla, Deputy Vigil, and all other SMCSO personnel on scene remained on the perimeter and behind cover until Mr. Alirez was eventually taken into custody by NMSP at approximately 5:26pm. *Id.* at 14. At no time did Deputy Vigil take any action to enter the residence where Mr. Alirez was located nor did she attempt to take Mr. Alirez into custody because he had demonstrated that he intended to harm law enforcement. *Id.* at 14–15. Plaintiffs dispute this fact by noting that arriving at the residence and hearing the first gunshot, Deputy Vigil's partner, Deputy Adkins, drew his handgun and attempted to open the metal security door. (Doc. 101) at 3. This fact does not controvert County Defendants' undisputed material fact.

    *B. Procedural History*

Angel Salcido, personal representative of the wrongful death estate of Cristal Cervantes, and Wanda Martinez, (Plaintiffs), filed a complaint against County Defendants that was removed to this Court on December 29, 2021. (Doc. 1). As relevant for this Motion, Plaintiffs allege a Constitutional substantive Due Process violation against County Defendants via Section 1983. U.S. Const. amend XIV; 42 U.S.C. § 1983. (Doc. 19 (amended complaint, Count I)) at ¶¶ 67–138 (Doc. 57) at 11–20. On August 24, 2023, County Defendants filed the Motion for Partial Summary Judgment of the Due Process claim, which, is fully briefed. (Docs. 87, 101, 104).

II. *Standards of Law*

    *A. Summary Judgment*

7

Summary judgment should be granted if the movant establishes that there is no genuine dispute of material fact "and that the movant is entitled to judgment as a matter of law." *Sawyers v. Norton*, 962 F.3d 1270, 1282 (10th Cir. 2020) (quoting Fed. R. Civ. P. 56(a)). A fact is considered material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Id.*

The parties must support factual allegations with evidence and the Court is free to consider materials such as depositions, documents, and affidavits. Fed. R. Civ. P. 56(c)(1)(A). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the nonmovant is required to put in the record facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 248. In applying this standard, the Court resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant. *See Hunt v. Cromartie*, 526 U.S. 541, 551–52 (1999) (quoting *Anderson*, 477 U.S. at 255). However, the nonmoving party cannot rely upon conclusory allegations, contentions of counsel, speculation, suspicion, or conjecture to defeat summary judgment. *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988) (citations omitted); *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200–01 (10th Cir. 2022) (citations omitted). A "plaintiff's version of the facts must find support in the record." *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011) (citation omitted). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings."

8

*GeoMetWatch Corp.*, 38 F.4th at 1200 (quoting *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098 (10th Cir. 2019)).

### B. Qualified Immunity

Section 1983 of Title 42 authorizes a private cause of action against any person acting under color of state law for "the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. Individual defendants named in a § 1983 action, however, "may raise a defense of qualified immunity[.]". *Irizarry v. Yehia*, 38 F.4th 1282, 1287 (10th Cir. 2022) (quoting *Est. of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014)). Qualified immunity "creates a presumption that the defendant is immune from suit." *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021) (quoting *Est. of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020)). To overcome this presumption, a plaintiff bears a heavy burden to show both (1) that "the defendant's actions violated a constitutional or statutory right and (2) that right was clearly established at the time of the defendant's complained-of conduct." *Irizarry*, 38 F.4th at 1287–88 (quoting *Truman*, 1 F.4th at 1235).

If the plaintiff fails to satisfy either prong of the qualified immunity test, the court must grant qualified immunity and summary judgment. *McCowan v. Morales*, 945 F.3d 1276, 1282 (10th Cir. 2019) (quoting *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1212–13 (10th Cir. 2019)). "In short, although we will review the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (internal citation omitted).

A plaintiff "must produce facts sufficient to show both that the defendant's alleged conduct violated the law and that that law was clearly established when the alleged violation

9

occurred" to overcome the presumption that a defendant is protected by qualified immunity. *Bruning v. Pixler*, 949 F.2d 352, 356 (10th Cir. 1991) (quoting *Pueblo Neighborhood Health Ctrs., Inc.*, 847 F.2d at 646). Only if the plaintiff meets this burden does the defendant "bear the usual summary judgment movant's burden of showing that no material issues of fact remain that" defeat the claim of qualified immunity. *Id.* (quoting *Pueblo Neighborhood Health Ctrs., Inc.*, 847 F.2d at 646); *see also Koch*, 660 F.3d at 1238.

### III. Fourteenth Amendment Substantive Due Process

Plaintiffs allege a Constitutional Substantive Due Process violation against County Defendants under 42 U.S.C. § 1983. U.S. Const. amend XIV. (Doc. 19 (Amended Complaint, Count I)) at ¶¶ 67–138 (Doc. 57) at 11–20. County Defendants contend that as a matter of law, they did not violate Ms. Cervantes' Fourteenth Amendment Substantive Due Process right because they did not have a special relationship with her and did not create the danger resulting in her shooting and death. (Doc. 87) at 3. County Defendants also contend that they did not act or fail to act in any way that shocked the conscience; and, in the alternative, did not violate any clearly established Fourteenth Amendment law. *Id.* at 3–4. This Court finds Defendants' arguments persuasive.

#### A. Due Process claims

Plaintiffs claim County Defendants violated Ms. Cervantes' Fourteenth Amendment Substantive Due Process right "to be free from a government employee affirmatively placing her in a position of actual, particularized danger." (Doc. 19) at ¶ 103. Plaintiffs also claim violation of Ms. Cervantes' Fourteenth Amendment Substantive Due Process rights through the failure by all Defendants to investigate competently and to take all appropriate actions regarding the known and foreseeable criminal violations by Mr. Alirez. *Id.* at ¶ 70. Finally, as relevant to this claim

and Motion, Plaintiffs allege that County Defendants "committed an affirmative act" when they did not "competently investigate and take appropriate action on known and foreseeable criminal violations of law of third parties" and "by failing to evaluate properly the particular on-going vulnerability to Cristal Cervantes, to impose any command or control over the scene, to devise a tactical plan and communicate to officers on scene and between Defendant agencies, and other necessary and reasonable actions designed to avoid preventable injury or death, in response to the known danger presented to Cristal Cervantes." *Id.* at ¶ 104.

### B. Due Process Analysis

#### 1. Lack of Exceptional Circumstances

This Court summarizes Plaintiffs' Substantive Due Process claims noted above as alleging that County Defendants failed to act appropriately, and Ms. Cervantes died as a result. *See id.* at ¶¶ 70, 103–04. In contrast to Plaintiffs' position, and despite the unquestionably tragic nature of the events, Plaintiffs acknowledge the general rule that "state officials are not liable for acts of private violence." (Doc. 101) at 13 (citing *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989)). However, Plaintiffs argue that an exception applies to this matter, that being, a state official may be liable when such state actor "affirmatively acts to create, or increase a plaintiff's vulnerability to, danger from private violence." *Id.* (quoting *T.D. v. Patton*, 868 F.3d 1209, 1221 (10th Cir. 2017)).

#### a. Creation of the danger

Plaintiffs note that under the danger-creation theory, they must show that a state actor "affirmatively act[ed] to create or increases a plaintiff's vulnerability to, danger from private violence." *Id.* at 14 (quoting *Currier*, 242 F.3d at 923). Plaintiffs seeking to hold state actors liable for private violence also must demonstrate:

> (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way;
> (2) plaintiff was a member of a limited and specifically definable group;
> (3) defendant's conduct put plaintiff at substantial risk of serious, immediate, and proximate harm;
> (4) the risk was obvious or known;
> (5) defendants acted recklessly in conscious disregard of that risk; and
> (6) such conduct, when viewed in total, is conscience shocking.

*Id.* (quoting *T.D. v. Patton*, 868 F.3d 1209, 1222 (10th Cir. 2017)).

Plaintiffs contend that "County Defendants created or increased the danger posed to Cristal Cervantes' vulnerability to danger from private violence." *Id.* Plaintiffs contend that the affirmative action consists of County Defendants "choos[ing] to stand by and wait while Cristal Cervantes died a slow and painful death," and "stand[ing] by and wait[ing] in such a way that hindered [Mr. Alirez] from leaving the house." *Id.* at 15. Plaintiffs speculate that "[h]ad County Defendants not been so conspicuous about their presence, [Mr. Alirez] would likely have not stayed stuck in the house as long as he did[,] continuing to harm Cristal." *Id.* For support, Plaintiffs note that Mr. Alirez said that he "did not want to leave the house because of the police presence outside." *Id.*

Although County Defendants' inability to save Cristal Cervantes is tragic, Plaintiffs are attempting to hold County Defendants liable for failing to take actions, not for acting affirmatively. The facts of this case do not support Plaintiffs' contention that County Defendants simply stood by and waited while Ms. Cervantes died. Plaintiffs do not cite any caselaw with similar facts of a Due Process violation such that County Defendants would have been put on notice that their behavior violated Ms. Cervantes' constitutional rights. In contrast, in their reply, County Defendants cite Tenth Circuit precedent explaining that "inaction by the state, even in the face of known danger, is not enough to trigger a constitutional duty to protect unless the state has a custodial or other special relationship with the victim." (Doc. 104) at 6 (quoting *Seamons*

12

*v. Snow*, 84 F.3d 1226, 1236 (10th Cir. 1996)). And as County Defendants point out—and this Court discusses below—they did not have a special relationship with Ms. Cervantes. To be clear, Plaintiffs do not cite any caselaw with similar facts analogizing their contention that County Defendants' conspicuous presence somehow caused Mr. Alirez to stay in the house and to continue harming Ms. Cervantes. Thus, Plaintiffs' allegations cannot form the basis for a Substantive Due Process claim against County Defendants.

In addition, Plaintiffs also cannot meet the final conscience-shocking factor to overcome the general rule that a state is not liable for a private actor's violence. *See Patton*, 868 F.3d at 1222. For behavior to reach the level of shocking the conscience, it must have an element of the outrageous, truly conscience shocking. *Id.* (citation omitted); *Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1222–23 (10th Cir. 2006). For example, "a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." *Camuglia*, 448 F.3d at 1222 (quoting *Moore v. Guthrie*, 238 F.3d 1036, 1040 (10th Cir. 2006)).

Plaintiffs argue that the facts presented in this case entail conduct that is more than negligent, less than intentional, and satisfies the conscience-shocking standard. (Doc. 101) at 17–18 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998) (other citations omitted). Plaintiffs note that the "length of deliberation and deference to local policy-making bodies are factors in the conscience-shocking analysis." *Id.* at 18 (citing *Green v. Post*, 574 F.3d 1294, 1300, 1303 (10th Cir. 2009)). Plaintiffs also note that state officials can be held liable when it is demonstrated they were subjectively aware of a substantial risk of serious harm to a plaintiff, and they have the opportunity for "reflection and unhurried judgments." *Id.* (citing

13

*Green*, 574 F.3d at 1303) (citations to out of circuit authority omitted). This Court takes these factors into consideration.

In response to County Defendants' Motion and assertion that their behavior did not shock the conscience, Plaintiffs provide a few facts—but mostly conclusory arguments—to support their position that County Defendants' behavior "was certainly egregious and outrageous rising to the level of shocking the conscience." (Doc. 101) at 19. Plaintiffs contend that although County Defendants were aware through the Facebook live stream that Ms. Cervantes was alive, they "chose to sit back and watch … as Cristal Cervantes slowly died." *Id.* at 19. Plaintiffs object to County Defendants choosing "to let NMSP take control of the situation knowing that the TAC team … wouldn't arrive for an unreasonable amount of time under the circumstances." *Id.* at 19–20. Plaintiffs also contend that County Defendants "displayed deliberate indifference to an extreme risk of very serious harm to [Ms. Cervantes]—certain death by being left alone with an armed gunman who had 'mental issues,'" instead of choosing live-saving measures consistent with their statutory duties and training. *Id.* at 19 (citing Defendants' UMF 7). But Plaintiffs cite no law supporting their arguments. Plaintiffs complain about the "two hours of time" County Defendants had to reflect continuously "about if they were doing enough to decrease her vulnerability to private violence." *Id.*

Plaintiffs' frustrations regarding this emotionally disturbing event are very understandable. Although it is possible County Defendants did not act perfectly, none of the alleged actions or inactions, individually or in total, in the context as presented by Plaintiffs, rise to the level of shocking the conscience. Based on a review of the undisputed facts and all disputed facts resolved in favor of Plaintiffs, this Court concludes that as a matter of law, County Defendants' behavior in total (and regarding the actions noted and alleged by Plaintiffs) could

not be found by any reasonable jury to shock the conscience and are not shocking to the judicial conscience. Although the entire event, including the violent actions of Mr. Alirez, is shocking and regrettable, County Defendants' behavior could not shock the conscience of any reasonable set of jurors. Therefore, this conclusion of law provides an alternative basis for this Court to grant County Defendants' partial motion for summary judgment on the Due Process claims. For this independent reason, Plaintiffs' Due Process claim against the County Defendants fails and County Defendants' Motion on this claim shall be granted.

### b. Lack of special relationship

In their reply, County Defendants correctly note that Plaintiffs did not present any argument or allege any facts supporting that Ms. Cervantes had a "special relationship" with the state, the other potential exception to the general rule that a state is not liable for violent actions by a private party. (Doc. 104) at 6–7; *see also* (Doc. 87) at 19–20 (arguing County Defendants did not have a special or custodial relationship with Ms. Cervantes because she was not incarcerated, institutionalized, or in state custody at the time of her shooting and death) (citing *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1280 (10th Cir. 2003)). Not only is this exception waived, but also, this Court concludes as a matter of law that there is no special relationship alleged that can provide the basis for this exception to the general rule that a state is not liable for violent actions by a private party.

### 2. No Clearly Established Violation

In the alternative, County Defendants contend that "the individually named County Defendants are entitled to qualified immunity because they did not violate Ms. Cervantes' clearly established rights." (Doc. 87) at 25. For the reasons discussed below, this Court is persuaded by

County Defendants' argument. This conclusion provides an alternative basis to grant the partial motion for summary judgment and dismiss the Due Process claim against County Defendants.

A right is clearly established "when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Truman*, 1 F.4th at 1235 (quoting *Thomas*, 765 F.3d at 1194). "The salient question is whether the state of the law at the time of an incident provided 'fair warning' to the defendants that their alleged conduct was unconstitutional." *Reavis Estate of Coale v. Frost*, 967 F.3d 978, 992 (10th Cir. 2020) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)) (other citations and alterations omitted). Put another way, the Tenth Circuit asks, "whether the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Halley v. Huckaby*, 902 F.3d 1136, 1156 (10th Cir. 2018) (citations and internal quotation marks omitted).

Clearly established law "must remain moored in a specific set of facts" to show that the "violative nature of *particular* conduct is clearly established." *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1303 (10th Cir. 2021) (citation omitted). To that end, the Supreme Court has repeatedly instructed courts "not to define clearly established law at too high a level of generality." *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Notably, plaintiff bears the burden of citing to the Court what plaintiff thinks constitutes clearly established law. *Crane*, 15 F.4th at 1303 (quoting *Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010)). As discussed further herein, Plaintiffs have failed to meet this burden.

Plaintiffs rely on *Ross v. U.S.*, to argue that Ms. Cervantes' Due Process rights were clearly established at the time of County Defendants' conduct. 910 F.2d 1422 (7th Cir. 1990).

16

(Doc. 101) at 17. This Court first concludes that *Ross* is inapposite. In *Ross*, a Deputy Sheriff used his authority to prevent private citizens from attempting to save a drowning child. *Ross*, 910 F.2d at 1433. Plaintiffs contend *Ross* clearly establishes that a state actor is not entitled to qualified immunity if they are aware of a substantial risk of death "yet consciously chose a course of action that ignore the risk." (Doc. 101) at 17 (quoting *Ross* 910 F.2d at 1433). Plaintiffs' contention, however, ignores the clearly established right the Seventh Circuit focused on: "that a citizen in peril for his life ha[s] a constitutional right that prevent[s] a police officer from cutting off private avenues of lifesaving rescue without providing an alternative." *Ross*, 910 F.2d at 1432.

Plaintiffs point to no facts from *Ross* that are analogous to those in this case. Instead, Plaintiffs argue that despite knowing the substantial risk of death Ms. Cervantes faced, Undersheriff Padilla did not allow "his trained and armed SMCSO deputies who were qualified to rescue [Ms. Cervantes]. (Doc. 101) at 17. Instead, he "wait[ed] hours for the 'authorized' rescue SWAT team to arrive from Farmington." *Id.* Plaintiffs' contention ignores the danger that Mr. Alirez posed to the officers and innocent bystanders. *See* (Doc. 87) at 15. Such facts make *Ross* readily distinguishable from this case. Moreover, as County Defendants rightly note, a single Seventh Circuit case is not enough to clearly establish the law in the Tenth Circuit. (Doc. 104) at 11 (citing *Irizarry v. Yehia*, 38 F.4th 1282, 1284 (10th Cir. 2022) ("the weight of authority from other circuits may clearly establish the law when at least six other circuits have recognized the right at issue.")). Thus, as a matter of law, when interpreted in favor of Plaintiffs, these facts cannot be interpreted by any reasonable jury to violate clearly established law. Plaintiffs have not cited a single case on point with these facts that could have put officers on notice their conduct entailed a Constitutional violation.

This Court concludes that Plaintiffs have not alleged a violation of a clearly established right or that any violation would be obvious to a reasonable officer based on the undisputed facts, or facts that Plaintiffs have alleged and emphasized in response to the Motion. This Court therefore concludes that County Defendants' Motion should be granted as to Plaintiffs' Due Process claim.

*IV. Conclusion*

For the reasons discussed, the Court concludes that County Defendants' behavior was not conscience shocking, did not create the danger suffered, nor increase the vulnerability of the victim to the danger. In the alternative, County Defendants are entitled to qualified immunity because Plaintiffs have not alleged a violation of a clearly established right. Therefore, this Court grants County Defendants' Motion for Partial Summary Judgment (No. I) on the Fourteenth Amendment Substantive Due Process Claim Based on the Application of Qualified Immunity:

1) County Defendants' Motion for Partial Summary Judgment (No. I) on the Fourteenth Amendment Substantive Due Process Claim Based on the Application of Qualified Immunity is granted; and,

2) The Fourteenth Amendment Substantive Due Process Claim against County Defendants is dismissed with prejudice.

IT IS SO ORDERED.

UNITED STATES DISTRICT JUDGE