FOR THE DISTRICT OF NEW MEXICO

ANGEL SALCIDO, personal representative of THE
WRONGFUL DEATH ESTATE OF CRISTAL
CERVANTES, WANDA MARTINEZ,

   Plaintiffs,

vs.                      Civ. No. 21-01222 KG/JHR

CITY OF LAS VEGAS, LAS VEGAS POLICE
DEPARTMENT, CHIEF ADRIAN CRESPIN,
SGT. ELIAS RAEL, SAN MIGUEL COUNTY, SAN MIGUEL
COUNTY SHERIFF'S OFFICE, UNDERSHERIFF MIKE
PADILLA, DEPUTY JAYME VIGIL, NEW MEXICO
DEPARTMENT OF PUBLIC SAFETY,
NEW MEXICO STATE POLICE, JOHN DOE 1,
LT. HUGO MUNOZ, SGT. MARK LUCERO,
PATROLMAN MIGUEL SENA,

   Defendants.

## MEMORANDUM OPINION AND ORDER

   THIS MATTER comes before this Court on a Motion for Partial Summary Judgment (No. II) by Defendants San Miguel County, San Miguel County Sheriff's Office, Undersheriff Mike Padilla, and Deputy Jayme Vigil (collectively "County Defendants"). (Doc. 89). The Motion is fully and timely briefed. *See* (Docs. 89, 102, 105).

   As discussed in previous memorandum opinion and orders, the facts giving rise to this case concern an exceedingly unfortunate and regrettable violent murder. The second-guessing of the officers' actions and inactions by those who have suffered egregious loss is understandable. However, no reasonable jury could find County Defendants liable for negligent investigation as there is no duty to investigate crime in any particular manner or time frame and Plaintiffs do not allege County Defendants ignored the crime in progress. Furthermore, this Court concludes that

the behavior and investigation of County Defendants did not cause the battery or death of Ms. Cervantes. Therefore, this Court must dismiss the state law negligence claims.

## I. Background

### A. Factual Background

All the facts discussed below were discussed in this Court's Memorandum Opinions and Order on County Defendants' Motion for Summary Judgment (No I). Nonetheless, the Court recounts these tragic facts here. The following facts are either undisputed or interpreted favorably towards non-moving Plaintiffs for purposes of this Motion, unless otherwise noted.

On Sunday, November 8, 2020, sometime before 3:00 p.m., San Miguel County Sheriff's Office (SMCSO) Deputy Jayme Vigil was on patrol, traveling on Collins Drive in Las Vegas, New Mexico. (Doc. 87) at 4 (citing (Doc. 87-1)). Two individuals, Guillermo Rodriguez and Patricia Baca, flagged down Deputy Vigil and described a phone call Ms. Baca received from Veronica Martinez, the mother of Cristal Cervantes. *Id.* (citing (Doc. 87-1) at 1–2). Ms. Baca told Deputy Vigil that Ms. Cervantes' mother was requesting a welfare check because Cristal Cervantes called her mother, indicating that Alejandro Alirez, also known as "Tuffy," was at her residence on Peggy Lee Lane and was "irate." *Id.* (citing (Doc. 40-2) at 2). Ms. Baca indicated to Deputy Vigil that Mr. Alirez was mentally ill and possibly psychotic. *Id.* at 5 (citing (Doc. 87-1) at 2). Mr. Rodriguez indicated to Deputy Vigil that Mr. Alirez was armed with a gun. *Id.* (citing (Doc. 87-1), at 3). Deputy Vigil relayed this information to SMCSO Deputy Devin Adkins, whose vehicle was located behind Deputy Vigil's. *Id.* at 6 (citing (Doc. 87-1) at 3). The deputies drove their units to 409 Peggy Lee Lane to conduct a welfare check. *Id.* (citing (Doc. 87-1) at 3). The deputies parked their marked police vehicles on the street to the left of the residence in clear view. (Doc. 101) at 4; *see* (Doc. 104) at 4.

At approximately 14:59:06, (2:59 PM), Deputies Vigil and Adkins arrived at Ms. Cervantes' residence. (Doc. 87) at 6 (citing (Doc. 87-1) at 2). The deputies walked up to the front door of Ms. Cervantes' residence and Deputy Adkins knocked on the security screen door. *Id.* (citing (Doc. 87-1) at 3). Seconds later, the deputies heard a gunshot and a woman screaming. *Id.* at 7 (citing (Doc. 87-1) at 3). This first gunshot after the deputies' arrival was fired at 14:59:37 (2:59:37 PM). *Id.* (citing (Doc. 79) at 3). Although Deputy Adkins attempted to open the security screen door, it was locked. *Id.* (citing (Doc. 87-1) at 3). When the deputies heard the first shot, they moved from the front to the side of the residence. *Id.* (citing (Doc. 87-1) at 3). As they were making this alteration in position, both deputies called out on the radio "shots fired." *Id.* (citing (Doc. 87-1)) at 3).

After changing their position, the deputies heard three separate gunshots fired from inside the residence. *Id.* at 7–8 (citing (Doc. 87-1) at 3–4). After hearing the three additional rounds, the deputies moved behind Deputy Vigil's vehicle, utilizing it for cover and concealment. *Id.* at 8 (citing (Doc. 87-1) at 4).

Deputy Vigil retrieved her duty rifle from her trunk and utilized the trunk of her marked police vehicle as cover. (Doc. 87) at 8 (citing (Doc. 87-1) at 4). Deputy Atkins positioned himself near the rear driver's side wheel of Deputy Vigil's unit. (Doc. 87) at 8 (citing (Doc. 87-1) at 4). Shortly thereafter, the deputies then heard rounds hitting either Deputy Vigil's or Deputy Atkins' vehicle. *Id.* at 8–9 (citing (Doc. 87-1) at 4–5). Deputy Vigil observed one round causing the front passenger tire to deflate, and informed radio dispatch every time a shot was fired. *Id.* at 9 (citing (Doc. 79) at 4). Although Plaintiffs purport to dispute County Defendants' contention that the gunfire from Mr. Alirez was pinning down the deputies, Plaintiffs do not dispute that the deputies were taking cover and were under fire, but instead note a conversation

3

in which Deputy Vigil's boss tells her to maintain cover and she reports this fact to Deputy Atkins. (Doc. 101) at 2. This is not a genuine dispute regarding a material fact.

At approximately 3:01:37 p.m., Mr. Alirez began live-streaming his actions on Facebook. (Doc. 87) at 10. This Facebook live stream reveals multiple facts, including the following: At approximately 3:02 p.m., the live stream begins capturing Mr. Alirez's actions. *See id.* About eleven seconds in, Mr. Alirez states: "[Ms. Cervantes] is still alive." *Id.* At approximately the 00:50 second mark of the live stream, the video reveals Mr. Alirez raising his handgun and pointing the muzzle of the gun in the direction of Ms. Cervantes' head. *Id.* Approximately six seconds later, the video shows Mr. Alirez fire a round at Ms. Cervantes' head, shows her head move, and shows blood splattering on the wall. *Id.*

The subsequent autopsy revealed that the shot to the head likely produced the fatal wound. *Id.* at 11 (citing (Doc. 40-4) at 2–3 (indicating "the wound to the head caused the most significant damage, including skull fractures and bleeding and injury to the brain [while] the other wounds caused minor injuries"). Plaintiffs dispute that the autopsy is conclusive evidence that Ms. Cervantes was going to die due to the head wound but offer no evidence suggesting otherwise. (Doc. 101) at 2–3. For purposes of this Motion, the Court concludes this fact is undisputed as a matter of law. *See GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200–01 (10th Cir. 2022) (citations omitted) (nonmoving party cannot rely upon conclusory allegations, contentions of counsel, speculation, suspicion, or conjecture to defeat summary judgment). Without any factual support, Plaintiffs' counsel's speculation is insufficient to create a genuine dispute.

At approximately 03:02 p.m., at 01:08 seconds into live stream, Mr. Alirez fires another shot. (Doc. 87) at 11. Approximately fifteen seconds later, the live stream reveals him firing

4

another shot, still at approximately 03:02 p.m. *Id.* Around the 2:44 mark of the live stream, Mr. Alirez fires another shot, and yet another shot at the 2:56 mark of the live stream. *Id.* Beginning at approximately the 3:11 mark of the live stream video (3:04 p.m.), Mr. Alirez states: "Oh f***, I blew her eye out dog!" *Id.* And at approximately the 5:28 mark of the live stream (about 3:06 p.m.), the video's soundtrack reveals Mr. Alirez firing his gun again. *Id.* at 12.

Around the 07:38 mark of the live stream (about 3:08 p.m.), Mr. Alirez brandishes his gun and states that he "killed his girl [Ms. Cervantes]." *Id.* at 12 (citing Exhibit E to State Defendants' MPSJ No. 1, 07:38–07:43). Just over a minute later, at the 08:48 mark, Mr. Alirez reappears in the video, stating he "killed them" and "there are two dead people." *Id.* (citing Exhibit E to State Defendants' MPSJ No. 1, 08:48–08:55). He immediately corrects himself and says, "one's still alive," and he then walks over to Ms. Cervantes, puts the camera near her, and records her labored breathing. *Id.* (citing Exhibit E to State Defendants' MPSJ No. 1, 08:55–09:09). Plaintiffs appear to dispute these facts to the extent that they indicate Ms. Cervantes was dead. *See* (Doc. 101) at 3. As Defendants point out, however, these facts, are supported by video evidence. The Court therefore determines these facts are undisputed. That said, Plaintiffs point out that Mr. Alirez continually corrects himself, stating at various times that Ms. Cervantes was alive. *Id.* And County Defendants do not appear to dispute this. *See* (Doc. 104) at 3.

At approximately the 18:35 mark of the live stream (from about 3:19 p.m. to 3:21 p.m.), the video soundtrack reveals another firing of the gun. (Doc. 87) at 12. At approximately the 27:54 mark of the live stream (about 3:28–3:30 p.m.), the video shows Mr. Alirez firing his gun at the police. *Id.* at 13 (citing Exhibit E to State Defendants' MPSJ No. 1, 27:50–27:56).

Nearly ten minutes later, around the 28:10 mark of the live stream video (3:29 p.m.), Mr. Alirez indicates that Ms. Cervantes is still alive, he had shot her in the stomach, and he

5

focuses his phone on her, with the video revealing her labored breathing. (Doc. 101) at 8 (citing Exhibit E to State Defendants' MPSJ No. I, 28:10–28:38). Around the 30:53 mark of the live stream, Mr. Alirez states "she [Ms. Cervantes] is still alive dog, you could hear her but…f*****s they called the cops." *Id.* (citing Exhibit E to State Defendants' MPSJ No. I, 31:00–31:04). Approximately seven minutes later, at the 38:09 mark of the live-stream video (3:39 p.m.), Mr. Alirez indicates that Ms. Cervantes is still breathing. *Id.* (citing Exhibit E to State Defendants' MPSJ No. I, 38:09). At approximately the 50:52 mark of the live stream video (around 3:52 p.m.), Mr. Alirez' Facebook live stream ends. *Id.* at 9 (citing Exhibit E to State Defendants' MPSJ No. I, 50:52).

Undersheriff Padilla was not on duty the afternoon of November 8, 2020. (Doc. 87) at 13. However, he heard Deputy Vigil and Deputy Adkins radio "shots fired." *Id.* Upon hearing this radio transmission, he immediately got in his unit and responded to the intersection of Collins Drive and Peggy Lee Lane, near 409 Peggy Lee Lane. *Id.* Undersheriff Padilla then established a command post at the intersection of Collins Drive and Peggy Lee Lane, knowing that officers from the Las Vegas Police Department (LVPD) and the New Mexico State Police (NMSP) were responding to the incident. *Id.* at 14. He instructed his deputies on scene to maintain a perimeter and remain behind cover because he was concerned that Mr. Alirez would shoot them. *Id.* Based on the situation, Undersheriff Padilla requested assistance from the NMSP tactical team because SMCSO did not have a tactical team, and he knew that NMSP's tactical team had the advanced training and the tools necessary to address the threat that Mr. Alirez posed to civilians and law enforcement. *Id.* Concerned Mr. Alirez would use deadly force against law enforcement officers or innocent bystanders, Undersheriff Padilla did not order or instruct SMCSO personnel to take any action against Mr. Alirez. *Id.* at 15.

6

Throughout the remainder of the incident, Undersheriff Padilla, Deputy Vigil, and all other SMCSO personnel on scene remained on the perimeter and behind cover until Mr. Alirez was eventually taken into custody by NMSP at approximately 5:26pm. *Id.* at 14. At no time did Deputy Vigil take any action to enter the residence where Mr. Alirez was located, nor did she attempt to take Mr. Alirez into custody, because he had demonstrated that he intended to harm law enforcement. *Id.* at 14–15. Plaintiffs dispute this fact by noting that arriving at the residence and hearing the first gunshot, Deputy Vigil's partner, Deputy Adkins, drew his handgun and attempted to open the metal security door. (Doc. 101) at 3. This fact does not controvert County Defendants' undisputed material fact.

### B. Procedural History

Angel Salcido, personal representative of the wrongful death estate of Cristal Cervantes, and Wanda Martinez, (Plaintiffs), filed a complaint against County Defendants that was removed to this Court on December 29, 2021. (Doc. 1). As relevant for this Motion, Plaintiffs allege state law claims for negligent investigation resulting in battery and wrongful death under the New Mexico Tort Claims Act, as well as negligent training, supervision, and retention, and loss of consortium. (Doc. 19 (amended complaint, Counts II–IV)) at ¶¶ 139–67. On August 24, 2023, County Defendants filed the Motion for Partial Summary Judgment of the state law negligence claims, which is fully briefed. (Docs. 89, 102, 105).

## II. Standards of Law

### A. Summary Judgment

Summary judgment should be granted if the movant establishes that there is no genuine dispute of material fact "and that the movant is entitled to judgment as a matter of law." *Sawyers v. Norton*, 962 F.3d 1270, 1282 (10th Cir. 2020) (quoting Fed. R. Civ. P. 56(a)). A fact is

considered material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Id.*

The parties must support factual allegations with evidence and the Court is free to consider materials such as depositions, documents, and affidavits. Fed. R. Civ. P. 56(c)(1)(A). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the nonmovant is required to put in the record facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 248. In applying this standard, the Court resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant. *See Hunt v. Cromartie*, 526 U.S. 541, 551–52 (1999) (quoting *Anderson*, 477 U.S. at 255). However, the nonmoving party cannot rely upon conclusory allegations, contentions of counsel, speculation, suspicion, or conjecture to defeat summary judgment. *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988) (citations omitted); *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200–01 (10th Cir. 2022) (citations omitted). A "plaintiff's version of the facts must find support in the record." *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011) (citation omitted). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *GeoMetWatch Corp.*, 38 F.4th at 1200 (quoting *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098 (10th Cir. 2019)).

*III. State Law Negligence under the Tort Claims Act*

As this Court has previously noted in this case, the New Mexico Tort Claims Act (NMTCA) waives immunity for battery and wrongful death "caused by law enforcement officers while acting within the scope of their duties." NMSA 1978, § 41-4-12 (2020). Furthermore, Section 29-1-1 imposes an affirmative duty to investigate; and officers can be held liable if their conduct was negligence and proximately caused the alleged injury. *Schear v. Bd. of Cnty. Comm'rs*, 1984-NMSC-079, ¶ 23, 101 N.M. 671 (citing NMSA 1978, § 29-1-1 (1979) (declaring it to be the duty of every peace officer "to investigate all violations of the criminal laws of the state which are called to the attention of any such officer or of which he is aware")). The New Mexico Supreme Court noted concerns about strict liability and concluded it does not apply: "Liability will not attach until all of the elements of negligence have been proved, including duty, breach of duty, and proximate cause." *Id.* at ¶ 21.

In *Schear*, the New Mexico Supreme Court held that "a governmental entity and its law enforcement officers may be held liable, after receiving notice, for negligently failing to take adequate action to protect a citizen from imminent danger and injuries." *Id.* at ¶¶ 2–7, (interpreting NMSA 1978, Sections 29-1-1 and 41-4-12). The court noted that although the determination of whether negligence occurred generally is a question for the jury, whether any duty exists as an initial determination "is a question of law for the courts to decide." *Id.* at ¶ 4 (citations omitted). The court further interpreted the clause "when caused by law enforcement officers," noting that it does not require commission of the tort by the officer, "but instead has the usual meaning of 'proximate cause' as a requirement for liability in an ordinary negligence case." *Id.* at ¶ 9 (citing *Methola v. Cnty. of Eddy*, 1980-NMSC-145, ¶¶ 19–20, 95 N.M. 329).

*IV. Failure to Investigate /Negligent Investigation*

County Defendants contend that "Plaintiffs' negligent investigation claim fails as a matter of law because New Mexico law does not confer a duty on County Defendants to investigate criminal activity in a specific manner or within a specific time frame." (Doc. 89) at 6. In support, County Defendants note this Court's earlier memorandum opinion and orders, which concluded that Plaintiffs' negligent investigation claim against City and State Defendants were unavailing. *Id.* at 7 (citing Docs. 78, 80).

Plaintiffs respond by restating their allegations and arguing that there are genuine issues of material fact for the jury regarding whether County Defendants met their statutory duty imposed by Section 29-1-1. (Doc. 102) at 4–5. Plaintiffs also assert, without explaining, that "[t]he theories of negligence as to County Defendants are markedly distinct from those tendered as to City Defendants and State Defendants." *Id.* at 7. Plaintiffs then argue that this Court's previous citation to *Ruff v. Bd. Of Regents of the Univ. of N.M.* "directly conflicts with settled New Mexico appellate authority on law enforcement liability under state law." *Id.* at 7–8. In response, County Defendants point out that "Plaintiffs have not produced any authority to counter County Defendants' assertion that…there is no duty to investigate crime in a particular manner or time frame." (Doc. 105) at 7. The Court agrees with County Defendants and rejects Plaintiffs' contention that *Ruff* directly conflicts with settled New Mexico appellate authority. The Court therefore concludes that Plaintiffs' negligent investigation claim against County Defendants is unavailing.

    A. *Negligent Investigation Claims*

Plaintiffs allege that under NMSA 1978 § 29-1-1, all defendants had a statutory and common law duty "to investigate all violations of the criminal laws of the state which are called

10

to the attention of any such officer or of which he is aware," specifically regarding Ms. Cervantes' safety. (Doc. 19) at ¶ 140. Plaintiffs also allege common-law duties on police officers. *Id.* at ¶ 142 (citing *Torres v. State*, 195-NMSC-025, ¶ 20, 119 N.M. 609 (common law purportedly imposes liability on police officers for "harm caused by the negligent performance of their statutory duty to investigate crime")). Plaintiffs further allege that all defendants failed to develop a reasonable plan and failed overall to respond and communicate appropriately to the "dynamic" situation that was not only life threatening to the victims in the residence but also to other residents in the area as well as the officers on scene. *Id.* at ¶¶ 144–47. Plaintiffs complain specifically about these issues with regards to the availability of the Facebook live stream video information. *See id.* at ¶¶ 147–48. They allege County Defendants' failures to respond better resulted in the death of Ms. Cervantes. *Id.* at ¶ 149.

  B.  *Negligent Investigation Analysis*

Plaintiffs cite *Schear* in support of their argument that there are genuine issues of material fact in dispute regarding whether the County Defendants' investigation satisfied their statutory duties. (Doc. 102) at 5 (citing 1984-NMSC-079, ¶ 23, 101 N.M. 671, 677). However, this Court concludes this matter is distinguishable from *Schear*. In *Schear* a County Sheriff completely failed to investigate a report of an assault in progress, which resulted in the torture and rape of the victim. 23 N.M. St. B. Bull. 192 (N.M. Ct. App. 1984 February 16, 1984)).[1] Unlike *Shear*, the undisputed material facts in this case clearly show that County Defendants did not completely fail to investigate the events regarding Mr. Alirez shooting Ms. Cervantes.

---

[1] The Court takes this opportunity to clarify the facts it cited in previous memorandum opinion and orders, (Docs. 78, 80). In those memorandum opinion and orders, the Court indicated the facts in *Schear* involved the sexual assault of a 12-year-old boy. The facts in *Schear*, however, involved the torture and rape of a woman. The factual differences do not impact the Court's analysis in those memorandum opinion and orders.

11

Furthermore, in *Ruff*, falsely accused and arrested individuals sued officers who allegedly failed to investigate who the actual perpetrator was despite evidence demonstrating the officers knew they were pursuing and prosecuting individuals innocent of the crime. *Ruff v. Bd of Regents of the Univ. of N.M.*, 2018 WL 565705, at *3 (D.N.M.). Presuming their allegations were true, even after the innocent individuals' attorney provided exculpatory evidence, the defendant officers spoke to the purported victim, "suggesting to her that she was mistaken about details in the video, thus attempting to influence her to 'alter her previous testimony.'" *Id.* The investigation ultimately led to the finding that there was "no credible or actionable evidence" against the purported falsely accused and arrested individuals, but only after two of them were indefinitely suspended from playing college football and the third was indefinitely banned from campus. *Id.* Nevertheless, the district court granted the motion to dismiss, holding that the plaintiffs had failed to state a claim under Section 29-1-1. *Id.* at *21. The court noted that law enforcement officers generally have a duty to exercise ordinary care but suggested this duty is "to members of the public who are at risk of injury by a criminal offender when the officers are performing or attempting to perform their duties." *Id.* at *20 (quoting *Cross v. City of Clovis*, 1988-NMSC-045, ¶ 6, 107 N.M. 251). The court concluded that the plaintiffs failed "to cite to any case holding that Section 29-1-1 creates a duty to investigate in a particular manner, and [did] not find support for such a reading in either the language of Section 29-1-1 or the case authorities construing the statute." *Id.*

Like the issue presented in *Ruff*, Plaintiffs complain about the way County Defendants investigated the case. And like the plaintiffs in *Ruff*, Plaintiffs before this Court have failed to cite any case holding that Section 29-1-1 creates any duty to anyone to investigate crimes in any

12

particular manner. *See id.* Thus, while the holding in *Ruff* is not binding, this Court again finds the reasoning and holding of *Ruff* persuasive.

In their response, Plaintiffs argue that it is for a jury to determine if County Defendants' investigation satisfied their "statutory duty imposed under Section 29-1-1." (Doc. 102) at 5. However, there does not appear to be any duty to investigate crime in any particular manner or time frame.

Based on the facts presented here that are undisputed or interpreted in Plaintiffs' favor, this Court concludes, as a matter of law, that no reasonable jury could find County Defendants liable for negligent investigation as there is no duty to investigate crime in any particular manner or time frame. *See Ruff*, 2018 WL 565705 at *20 (plaintiffs failed "to cite to any case holding that Section 29-1-1 creates a duty to investigate in a particular manner, and the court does not find support for such a reading in either the language of Section 29-1-1 or the case authorities construing the statute"). The Court's determination is supported by the New Mexico Supreme Court's discussion regarding the legislative intent behind the NMTCA. In *Methola v. County of Eddy*, the New Mexico Supreme Court explained

> the declared policy of this act indicates that the Legislature authorized the filing of claims against governmental entities *except in situations where the State may not have been able to act for some specific reason*, so long as the act complained of falls within the list set out in the Tort Claims Act.

1980-NMSC-145, ¶ 23 (emphasis added). The specific reason here is the undisputed fact that Mr. Alirez was actively shooting at County Defendants. And it is difficult to imagine a reason that better demonstrates when the state is prevented from acting than that presented here, where the County Defendants were faced with such obvious, life-threatening danger.

Although Plaintiffs contend it is for the jury to determine if a breach of duty occurred, as they acknowledge, this Court first must determine the presence of a relevant duty. *See Schear*,

13

1984-NMSC-079 at ¶ 21 ("Liability will not attach until all of the elements of negligence have been proved, including duty, breach of duty, and proximate cause"); (Doc. 102) at 4 ("Whether a duty exists is a question of law for the courts to decide") (citation omitted). For the reasons stated, this Court concludes that the negligent investigation/failure to investigate claim against County Defendants shall be dismissed.

*V. Negligence resulting in battery and wrongful death*

The NMTCA waives immunity for battery and wrongful death when it is "caused by law enforcement officers while acting within the scope of their duties." NMSA 1978, § 41-4-12. Regarding causation, under New Mexico law, behavior can "cause" an injury only if the "injury would not have occurred" without it. UJI 13-305 NMRA. It "need not be the only explanation for the injury, nor the reason that is nearest in time or place." *Id.* "It is sufficient if it occurs in combination with some other cause to produce the result." *Id.*

Section 41-4-12 does not create liability for a claim of general negligence. *See Dickson v. City of Clovis*, 2010-NMCA-058, ¶ 19, 148 N.M. 831 ("[N]o case has held that simple negligence in the performance of a law enforcement officer's duty amounts to commission of one of the torts listed in Section 41-4-12") (citing *Lessen v. City of Albuquerque*, 2008-NMCA-085, ¶ 38, 144 N.M. 314); *see also Bober v N.M. State Fair*, 1991-NMSC-031, ¶ 32, 111 N.M. 644 (same). Instead, "allegations of negligence based on one of the torts specified in Section 41-4-12 are appropriate only when a law enforcement officer's negligence allegedly caused a third party to commit one of the enumerated intentional acts." *Id.* at ¶ 20 (citing *Lessen*, 2008-NMCA-085, ¶ 39).

### A. Negligence resulting in battery and wrongful death claims

In their amended complaint, Plaintiffs allege that County Defendants—along with all other Defendants—breached their duty to appropriately evaluate "initial accurate and recent information supplied to Deputy Vigil by civilians outlining the high risk for violence at 409 Peggy Lane, [and] by failing to develop a reasonable and proportionate police response to what was known to be a high-risk situation, with known armed suspects and known captives and a known location." (Doc. 19) at ¶ 144. Plaintiffs allege that County Defendants "had sufficient time, in the face of known exigencies, to develop a coherent command structure/proportionate tactical plan to approach the situation." *Id.* In their amended complaint, Plaintiffs further allege:

> 148. All Defendants breached their duty to evaluate and process properly the tactical insight to be gained by virtue of a continuing real-time livestream of the active shooters' activities, whereabouts, intentions, and respective conditions of live captives inside 409 Peggy Lane. This duty included adapting any command structure/tactical plan for police intervention to the data that should have been processed in real-time from the active shooter himself. This breach included a complete break-down and essential absence in inter and intra-agency communication and communication between supervisory personnel and subordinate personnel, and other reasonable and necessary actions designed to save the lives of the known live captives at Peggy Lane.
>
> 149. The breach of these duties by all Defendants, supervisory and subordinate personnel from each police agency *resulted in the battery* and wrongful death of Crystal Cervantes for which immunity has been waived under the New Mexico Tort Claims Act.

*Id.* at ¶¶ 148–49 (emphasis added).

### B. Negligence resulting in battery and wrongful death analysis

Plaintiffs argue that the jury must decide whether the conduct of County Defendants "was the proximate cause of the plaintiffs' injuries." (Doc. 102) at 6. Plaintiffs argue that County Defendants "had the authority to take all necessary steps consistent with their assignment to protect Cristal's life via Section 3-13-2 NMSA." *Id.* They contend that it is for a jury to determine if County Defendants upheld their statutory duty. *Id.* at 5

15

This Court determines that as a matter of law, no reasonable jury could find that the behavior of County Defendants caused the battery to Ms. Cervantes resulting in her death because none of the County Defendants' alleged behavior caused Mr. Alirez to shoot Ms. Cervantes. *See Dickson*, 2010-NMCA-058, ¶ 20 ("[A]llegations of negligence based on one of the torts specified in Section 41-4-12 are appropriate only when a law enforcement officer's negligence allegedly caused a third party to commit one of the enumerated intentional acts.") (citing *Lessen*, 2008-NMCA-85, ¶ 39). For the reasons stated, this Court concludes that the negligence resulting in battery and wrongful death claim against County Defendants shall be dismissed.

*VI. Negligent Training*

Although the NMTCA waives immunity for negligent training and supervision by a law enforcement officer that causes the commission by a subordinate law enforcement officer of a tort listed in Section 41-4-12, County Defendants contend that they did not commit an underlying tort against Ms. Cervantes. (Doc. 89) at 13. County Defendants therefore request that Plaintiffs' claims set forth in Count III of Plaintiffs' amended complaint be dismissed. *Id.* Plaintiffs respond that they "have provided substantial evidence to show that there are genuine issues of material fact regarding whether County Defendants failed to properly supervise or train SMCSO personnel, in particular Deputy Vigil." (Doc. 102) at 6.

For the reasons previously stated, this Court concludes that the claim for negligent hiring, training, and supervision against County Defendants must be dismissed (Count III). The claim for Loss of Consortium (Count IV) also is a claim depending on the existence of another tort, and so too, must be dismissed. *See* (Doc. 19) at ¶ 163 ("[A]ll defendants … caused the Battery and Wrongful death of Cristal Cervantes"), ¶ 167 ("As a direct and proximate cause of the negligence

of all defendants, Plaintiff Wanda Martinez suffered damages to include emotional pain and suffering and loss of consortium").

*VII.    Conclusion*

For the reasons discussed, this Court concludes that no reasonable jury could find County Defendants liable for negligent investigation as there is no duty to investigate crime in any particular manner or time frame. Furthermore, this Court concludes that the behavior and investigation of County Defendants did not cause the battery or death of Ms. Cervantes. Therefore, this Court grants County Defendants' Motion for Partial Summary Judgment (No. II) on the state law negligence claims:

(1) County Defendants' Motion for Partial Summary Judgment (No. II) on the negligent investigation claim; negligence resulting in battery and wrongful death claim; negligent hiring, training, and supervision; and consortium claim is granted.

(2) The negligent investigation claim (Count II); negligence resulting in battery and wrongful death claim (Count II); negligent hiring, training, and supervision claim (Count III); and consortium claim (Count IV) against County Defendants are dismissed with prejudice.

IT IS SO ORDERED.

_____
UNITED STATES DISTRICT JUDGE